CIRCLE SECURITY AGENCY, INC., Plaintiff-Appellee and Cross-Appellant, *v.* LEWIS D. ROSS, Defendant-Appellant and Cross-Appellee.

First District (5th Division)    No. 80-2502

Opinion filed April 30, 1982.—Rehearing denied July 7, 1982.

George V. Bobrinskoy, Jr., and Dennis A. McMahon, both of Mayer, Brown & Platt, of Chicago, for appellant.

Robert Marks, of Marks, Marks and Kaplan, of Chicago, for appellee.

JUSTICE WILSON delivered the opinion of the court:
Plaintiff, Circle Security Agency, Inc. (Circle), brought a declaratory judgment action against Lewis D. Ross for the construction of a contract under which Circle paid Ross for certain services. The trial court found that Ross was entitled to compensation at the rate of $20,000 per year. Ross appeals from the amount awarded only, contending that the terms of the contract entitle him to $30,000 annually. Circle cross-appeals from the judgment, arguing that (1) the trial court erred in ruling that the contract had not been repudiated by Ross; and (2) Circle is entitled to damages. We affirm the judgment, with modification.

Circle is a general agent for Mutual of Omaha and United Benefit

Life Insurance Co. Years ago, defendant Ross created and developed Circle and during that time he established excellent rapport with the home office of the Omaha insurers. In 1966, with the approval of the home office, he sold his controlling interest in Circle to Bernard Levin and Harmon Kravitz, who were at the time operating a subagency under another general agent of the insurers.

The sale of the business was effectuated through several related documents, an agreement and plan of reorganization, a warranty agreement, and an employment agreement. The latter document, which is the basis of the present litigation, provides for Ross to be employed by Circle "in an executive and managerial capacity" for "the remainder of his life" at specified rates of compensation. In return, Ross is obligated to apply his "knowledge, skill, attention and experience to the best of his ability in the discharge of the duties and obligations thereof and to use his best efforts to further the interest of Circle."

From 1966 to 1971 Ross maintained an office for Circle in downtown Chicago. Pursuant to the terms of paragraph 2 of the agreement he received an annual salary of $35,000. After these first five years of Ross' employment, paragraph 2 provided that his salary would increase to $40,000 for his remaining years of service. In 1971, however, Levin and Kravitz closed Circle's downtown office, which they were entitled to do, and Ross then elected (under paragraph 6 of the contract) "to perform services to Circle on a consulting basis only, upon the terms and rate of compensation provided for such consulting services in paragraph 3 hereof." In pertinent part, paragraph 3 provides that

> "[If Ross becomes] physically incapacitated to such an extent as to prevent him, in the opinion of his physician, from reasonably performing his full time services hereunder, then from and after delivery to Circle of a letter or certificate of the physician to such effect, Ross shall only be required to render consulting services to Circle and shall only be required to devote such time in his employment as shall be consistent with the state of his health. If such incapacity shall continue for a period of more than 12 months, the compensation payable to Ross by Circle shall be reduced by $10,000 commencing on a date which is 12 months after delivery of the physician's letter or certificate referred to above."[1]

During the next seven years Levin and Kravitz made few requests of Ross for his consulting services, although the men regularly met to discuss

---

[1] After 1971, when he became a consultant, Ross' salary was decreased to $30,000 annually, which presumably represents the $10,000 reduction that applies pursuant to paragraph 3. He continued to be compensated at this amount until this litigation, when the trial court ruled that he should receive $20,000 instead.

general operations. Ross' major function was to maintain good relations with the insurers' home office, to protect Circle's status.[2]

The facts that led to this lawsuit occurred over a period of months in 1978, during which time the parties communicated primarily through letters. According to Bernard Levin's trial testimony, certain changes in marketing conditions caused him and Harmon Kravitz (Circle's operating officers), to reassess Circle's operations and status. In a letter to Ross dated February 17, 1978, Levin and Kravitz listed some of the economic and political factors which led to their review of Circle's structure. The letter indicated that they had consulted with their attorney concerning Ross' "contract of employment, the amount due * * * thereunder, and the quantity of services that Circle had a right to expect therefor." The February 17 letter further noted that they had "been rather lax up to now in not insisting on full compliance with the contract" but that they had "no choice but to insist upon such full and complete compliance so that the correct amount of salary to be paid [him could] be determined." The letter requested Ross to furnish a statement from his doctor attesting to his physical capacity or incapacity to perform under the contract, and concluded with a request for a meeting. Ross did not respond to this letter.

The record indicates that Ross had suffered a severe heart attack shortly after receiving the February 17 letter and was hospitalized until September. He was further confined to his home until October 1978, at which time he prepared to leave for his annual winter trip to his home in Arizona. For medical reasons he had spent winters in Arizona for a number of years. He also testified at trial that he viewed his consultant status as being similar to that of an independent contractor rather than as an employee in the master-servant sense.

In September 1978, the parties' attorneys met with Levin, Kravitz, and Ross' son to discuss a possible amendment or settlement of the contract. The negotiations were unsuccessful. Ross' son informed Kravitz and Levin that his father's health had improved to the point that he was able to perform his consulting duties.

In a letter dated October 4, 1978, Ross' attorney wrote to plaintiff's attorney regarding several matters and concluded with the statement that "[i]f Circle wishes Mr. Ross to perform specific consulting services consistent with the state of his health as provided in Exhibit B of the Agreement, Mr. Ross is entirely willing to do so. Circle should communicate its desire on this point in writing to Mr. Ross * * *."

In response to this letter, Levin wrote to Ross on October 12, 1978. He told Ross that Circle needed Ross' assistance with several major problems that Circle was facing, the most pressing being the home office's changing attitude toward its general agents. Expressing the fear that

---

[2] The agency can be terminated by Mutual and United upon 30 days' notice.

Circle might be eliminated by the home office, Levin asked Ross to accompany him to a meeting in Omaha, Nebraska, on November 13, 1978. He also expressed the desire to consult with Ross before the meeting if Ross was unable to attend. Finally, he reiterated the need for a face-to-face meeting, and told Ross that, regarding his vacation time, they needed to know his whereabouts and availability at all times.

Ross responded to the October 12 letter on October 24, 1978. He explained that he received Levin's letter as he was preparing to leave for his winter home in Phoenix. Ross stated that, having for years operated as a consultant pursuant to paragraph 6 of the contract, he was "not required to deal with others on your behalf, nor subject to your control over my vacation time or other use as to my time allocations." He further noted his belief that "undue urgency" was not necessary as to matters which have involved the general agents such as Circle for "some twenty years." He concluded with a request for certain information in order to prepare his consulting advice to them.

Before Ross' October 24 letter reached Kravitz and Levin, they sent him one dated October 25, 1978. In it they expressed concern that Ross had not responded to their October 12 letter and concluded that he did "not intend to honor" his contractual obligations. They also warned Ross that they would consider the contract terminated and intended to take action if he did not respond by October 30.

Ross then sent another letter, from Phoenix, dated October 31, 1978. In this letter he outlined his advice to Circle for use at the November meeting in Omaha.

Levin's response, dated November 3, 1978, thanked Ross for his advice but again requested a face-to-face meeting, stressing the need to discuss other problems as well as the one involving the home office. He also stated that Ross labored under a "gross misconception" regarding his rights as "Circle's employee" and that nothing gave him the right to unilaterally set conditions upon the rendition of his services or time and duration of his vacations. Finally, Levin enclosed a paycheck while reserving Circle's rights to recover any payments made if the contract was found to be terminated.

A November 13, 1978, letter from Ross indicated that he would abide by his own attorney's interpretation of the contract. He also stated that face-to-face meetings were not required under the contract and that he could give his recommendations in writing. He agreed to meet, however, if they would come to Arizona, because he would not be returning to Chicago until spring, as was his custom.

On December 27, 1978, plaintiff filed the complaint for a declaratory judgment. The trial court granted plaintiff's request for a preliminary injunction on January 23, 1979, to prevent defendant from notifying the

home office that plaintiff was in default, which would have permitted the home office to cancel Circle's contract. Plaintiff's payments to defendant under the contract were expressly made without a waiver of rights.

At the trial on the merits, Ross introduced evidence relating to his health. His treating doctor in Chicago, Mark Pomerance, was deceased at the time of trial and his affidavit was not allowed into evidence. The testimony of Dr. Alan Gordon, Ross' Arizona physician, was read into the record from an evidence deposition. He testified that Ross suffered from ischemic heart disease, a serious condition which affects the coronary arteries and restricts the blood flow to the heart. Ross also had suffered certain complications, congestive heart failure and abnormal heart rhythm. According to Dr. Gordon, Ross' condition did not impair his mental abilities but did restrict his physical activities. Cold weather would increase the severity of the symptoms. Dr. Gordon further testified that toward the end of October 1978, Ross' angina and fatigue had increased to the point that he could not walk a block without discomfort and that he should not be in a cold climate. In the doctor's opinion, because of the state of Ross' health in October 1978, he would have advised Ross not to travel to the November 13 meeting in Omaha, Nebraska; such a trip could have been life-threatening. When Dr. Gordon examined Ross in Phoenix in late October of 1978, he found no indication of congestive heart failure or abnormal heart rhythm but Ross complained of generalized aching and weakness. Dr. Gordon also saw Ross on November 7, at which time he told Ross to return again in two or three weeks because his health was still a serious concern. Although the doctor and Ross never discussed the advisability of Ross' travelling to Omaha,. the doctor testified that he would not have advised travel at that time.

Following the admission of Dr. Gordon's evidence deposition, defendant read certain portions of the discovery deposition of Harmon Kravitz, vice president of Circle. Ross' counsel asked,

"[I]s it a fact * * * that you and Mr. Levin expressed a desire to Mr. Ross somewhat prior to February, 1978, if some method could be worked out where a reduced form of lifetime payment to Mr. Ross could be agreed upon?

A. Yes, yes.

Q. And that was the essential purpose of your letter of February 17, 1978, is that correct?

A. Yes."

Kravitz then elaborated, after his counsel's objection to the question, by stating, "That was one part of the letter of 1978 that we sent to him, because in there we were also stating that we wanted to talk to him about his particular duties as a consultant." His attorney then added that the letter should speak for itself.

After further information from the deposition was read into evidence, plaintiff called Kravitz to testify in rebuttal. He said he had visited Ross in the hospital in August of 1978. In September of 1978, however, Ross' son told Kravitz and Levin that defendant had recovered his health and was available to do consulting work. From that time to the present, he was not told that travel or work would be deleterious to Ross' health. On cross-examination he reiterated that he did not know of any difficulties that Ross would face in travelling from Arizona to the Omaha meeting or to Chicago, but then admitted that he had indicated to the contrary in his discovery deposition.

After closing arguments, the trial court ruled that Mr. Ross was a consultant/employee of Circle's and as such, subject to plaintiff's reasonable terms of employment, consistent with the state of his health; that the evidence established that Ross had a heart condition of which all parties were aware; that the employment contract was intended to be a lifetime arrangement and was part of the consideration of the sale of Ross' controlling interest in Circle to Levin and Kravitz. Further, the court held that Ross breached a condition of the contract by failing to provide Circle with a physician's certificate as to his health, but that the breach was not material and did not justify termination of the contract. Accordingly, construing the compensation portion of the contract, the court held that Ross should receive $20,000 a year for his consulting services. This appeal followed.

OPINION

I

Plaintiff's cross-appeal from the judgment centers on Ross' employment status and his alleged refusal to perform as plaintiff directed. Such disobedience, Circle maintains, effectively terminated the contract and thus released Circle from its obligation to continue paying him. In sharp opposition to this view, defendant argues that Circle's request for his attendance of the Omaha meeting (and the series of letters beginning with the one dated February 17, 1978) was motivated by Circle's bad faith attempt to renegotiate or end the employment contract. Ross also agrees with the trial court's belief that his health was an important consideration in construing the contract, an issue that plaintiff minimizes.

The resolution of this controversy depends on the judicial construction of the parties' employment agreement. As in the case of interpreting any other type of contract, the main objective is to determine the intent of the parties. (*AZL Resources, Inc. v. Bromagen* (1979), 79 Ill. App. 3d 76, 398 N.E.2d 292.) The trial court judges the witnesses' credibility and evaluates the evidence in resolving conflicting versions of facts; our role in reviewing the judgment is limited to determining whether it is against the

manifest weight of the evidence or whether the trial court misapplied the relevant law.

■█ Initially, we reject plaintiff's argument that the trial court failed to consider all the evidence or to definitively rule on plaintiff's allegations that Ross had repudiated the contract. Absent contrary indications, which are not present here, we do not presume that the trial court ignores relevant evidence. Nor are we persuaded by Circle's belief that the trial judge failed to rule on its theories because he "made no finding that the evidence was *insufficient* to establish either a repudiation of the contract tantamount to an anticipatory breach or a deliberate, gross insubordination and disobedience by defendant as plaintiff's employee." (Emphasis added.) Circle's logic is patently flawed; the trial court's judgment in favor of Ross was an implicit rejection of plaintiff's contention that Ross' conduct amounted to a material breach of contract. Indeed, the court found that Ross' only breach was his failure to furnish Circle with a physician's certificate that he was unable to perform fully because of the state of his health. This failure, the court concluded, was not material and did not justify the forfeiture of the lifetime employment contract that was part of the consideration for Ross' sale of the controlling interest in Circle. We agree with the trial court's conclusion and find that it is not against the manifest weight of the evidence.

■█ Circle apparently believes, however, that the trial judge misapprehended the legal effect resulting from his finding that Ross was plaintiff's employee. Circle argues that, as Ross' employer, it had the absolute right to set reasonable terms and conditions of his performance under the contract; Ross' failure to comply with its reasonable requests for face-to-face conferences constituted insubordination, which terminated the employment relationship and gave rise to plaintiff's cause of action. In support of its contentions, plaintiff cites general principles of law, anticipatory breach of contract and rules governing master-servant relationships. If, as plaintiff contends, defendant by his words or actions failed to perform his duties without valid excuse, he would be liable for breach of contract and Circle's remedies would depend on whether the breach was found to be material or minor.[3] (See Restatement of Contracts sec. 275 (1932); Restatement (Second) of Contracts sec. 241 (1981), which provide guidelines for determining whether a breach is material or minor.) A minor breach is compensable in damages but will not generally give rise to a cause of action on the entire contract, nor excuse the non-breaching party's duty of

---

[3] This being the essential issue as to liability, we need not discuss Circle's anticipatory breach theory, which generally is used to provide a party with an immediate right of action against a reneging party whose performance is not currently due under an executory contract. (See generally 4 Corbin on Contracts sec. 959, at 852-53; sec. 973, at 905, 911-12 (1951); *Farwell Construction Co. v. Ticktin* (1978), 59 Ill. App. 3d 954, 376 N.E.2d 621, *aff'd on remand* (1980), 84 Ill. App. 3d 791, 405 N.E.2d 1051.)

counterperformance. *Cf*. Restatement (Second) of Contracts secs. 231-60 (1981), which explains the effects of nonperformance and uses the terms "total" and "partial" breach.

Focusing on Ross' role as Circle's employee, plaintiff argues that Ross' "unilateral" interpretation of his consulting duties amounts to a material breach because it usurps Circle's absolute control over its employee. Circle points out that the essential characteristic of the employer and employee relation is the employer's exercise of control over his employee's work (17 Ill. L. & Prac. *Employment* sec. 2 (1956)); without a valid excuse, the employee is not entitled to refuse to do the work he is employed to do. (56 C.J.S. *Master and Servant* sec. 62 (1948); 17 Ill. L. & Prac. *Employment* sec. 41 (1956).) Therefore, an employee's deliberate insubordination is grounds for his termination. 17 Ill. L. & Prac. *Employment* sec. 25 (1956).

While we accept those principles of law, we disagree with plaintiff's application of them to the facts of this case. It is true that Ross testified that he viewed himself as more of an "independent contractor" than as an employee in the master-servant sense. He told Levin and Kravitz that he was not subject to their control over his vacation time; he did not agree that a face-to-face meeting was necessary; and he refused to leave his Arizona home in the winter to fly to Chicago or to Omaha for the meeting. Further, he informed Kravitz and Levin that he could satisfy his consulting duties in writing and that they should send him written requests that detailed the nature of the problem and other information. We do not believe, however, that these actions amount to "insubordination." Ross never refused to perform as a consultant, although he disagreed as to the means by which his duties could be performed. We do not find his conduct unreasonable in light of the nature of consulting work, the parties' long-term business relationship and Ross' apparently satisfactory previous performance, and the condition of his health.

A consultant who gives expert advice as a professional may be an employee, but his status is not identical to that of a clerical worker or laborer. The latter type of worker generally performs definable tasks that are nondiscretionary or routine, whereas an employee of some authority, such as a corporate officer, exercises business judgment to a greater degree. We believe that Ross, either as a part-time consultant or a full-time executive, was paid to exercise professional judgment. Ross' contractual duties include advising plaintiff on matters involving the insurance industry and maintaining cordial relations with the home office of Circle's principal, Mutual of Omaha. Ross did offer plaintiff his advice regarding the Omaha meeting and further indicated his willingness to respond in writing to any specific consulting requests. His status as an employee does not transform his differences of opinion with Circle into insubordination

sufficient to terminate the employment contract. Furthermore, plaintiff's letter of February 17, 1978, and Kravitz' deposition statements support an inference that part of plaintiff's reason for accelerating its demands for Ross' services was to reduce his compensation under the contract. While Circle's desire to modify or even end the contract is not in itself wrongful, the trial court could have inferred that plaintiff's demands for meetings and other requests were made under a pretext. We conclude that the mere labelling of Ross as Circle's employee did not transform his conduct in the case into sufficient grounds for terminating the contract.

■■ Ross' health is another factor that is directly relevant to his failure to meet some of Circle's requests. The trial court emphasized the significance of Ross' heart condition and the medical testimony regarding the inadvisability of Ross' leaving his Arizona home to travel to Omaha or Chicago for meetings with Kravitz and Levin. The record supports the court's findings on the health issue, and we reject plaintiff's argument that Ross' refusal to obey its requests were unrelated to his health. Moreover, the contract itself indicates that the parties explicitly considered Ross' health when they entered into the agreement. The document provides that in the event that Ross became physically incapacitated to the point where he could not safely render full-time services in the physician's opinion, he would "only be required to devote such time as is consistent with the state of his health." If the incapacity continued for more than 12 months, Ross' full-time salary would be reduced by $10,000. If he were totally incapacitated and could not perform *any* services, he still would be entitled to $15,000 per year. This latter provision is a strong indication that the employment agreement was meant to provide Ross with a certain amount of financial security for life, even if he ceased to be capable of *any* performance thereunder. As long as he is able to perform, of course, he must comply with Circle's reasonable requests for his consulting services. We agree with the trial court that the major contractual limitation on Circle's demands is Ross' physical condition; he may not be required to comply with any requests which endanger his health. (See 9 Williston, Contracts sec. 1013B, at 51-52 (3d ed. 1967).) Therefore, to the extent his failure to comply with Circle's requests for a face-to-face meeting was caused by his annual trip to Arizona, a medical necessity of which plaintiffs were aware, we find that his actions were justified.

■■ In view of Ross' health, his expert consultant status, and the parties' long-term business association, therefore, we hold that Ross was not insubordinate and did not materially breach his contract. His expression of opinion as to the scope of his duties does not equate with a refusal to obey orders in the circumstances of this case, especially considering Circle's alleged motivation to modify or end his contract. To avoid future controversy however, we admonish both parties to use good faith in honoring

their contract. Thus, if Ross is asked to meet with Levin and Kravitz while he is in Chicago, he cannot ignore the request merely because he decides it is unnecessary. Assuming he is physically able to comply, he must do so. Plaintiff on the other hand, cannot make numerous demands for services that are not needed under the guise of its right as an employer to control its employees.

## II

Although we conclude that the evidence amply supports the trial court's factual finding that Ross had not materially breached the contract, we believe that the court misconstrued the compensation provisions of the contract. As previously indicated the agreement provides for different levels of compensation to be paid upon the happening of certain contingencies. Under paragraph 2 of the contract Ross was to receive $35,000 per year for the first five years of full-time employment and thereafter, $40,000 per year. Paragraph 3 states that if Ross becomes physically incapacitated for more than 12 months and his physician certifies that Ross is unable to perform full-time services, "the compensation payable to Ross by Circle shall be reduced by $10,000 commencing on a date which is 12 months after the delivery of the physician's letter * * *." Thus, if and when the health-related contingency of paragraph 3 occurs, Ross' full-time salary of either $35,000 or $40,000 would be reduced to $25,000 or $30,000 and he would become a "consultant." The lower figure would be appropriate if he became a consultant in the first five years of service.

Paragraph 3 further discusses the effect of Ross' mental incapacity, providing that Ross' compensation would be reduced to $15,000 a year if and when Ross is adjudicated mentally ill or incapacitated or if his physician so certifies. Upon the restoration of his mental health, however, paragraph 3 provides that:

> "his physician shall by letter or certificate state that Ross has recovered from his total incapacity or mental illness and setting forth the facts upon which statement or certificate is based, then Ross shall resume his duties, either on a full-time basis or on a consulting basis, and his compensation shall be reinstated at the rate of *$40,000 per year, $35,000 per year, $30,000 per year, or $25,000 per year, as the case may be*." (Emphasis added.)

As the facts indicate, Ross had become eligible to receive $40,000 per year at the time he became a consultant pursuant to paragraph 6 of the contract. This paragraph required Circle to maintain a downtown office for Ross for at least five years and further provided that if and when the office was closed, Ross could, "upon thirty (30) days written notice to Circle, elect to perform services to Circle on a consulting basis only, upon

the terms and rate of compensation provided for such consulting services in Paragraph 3 hereof." It is undisputed that Circle paid Ross $30,000 after it closed the downtown office and Ross became a consultant.

The trial court, in construing these provisions, held that Ross should receive only $20,000, which represents a second $10,000 reduction from Ross' full-time rate of $40,000. Circle, as cross-appellee, justifies this result by arguing that the paragraph 6 consultant status is for "general" consulting services, whereas the paragraph 3 consultant status applies to "limited" consulting services based on Ross' health. Accordingly, Circle argues, since Ross was receiving $30,000 per year in 1978, the court was correct in further reducing Ross' salary to $20,000 under paragraph 3 when his health deteriorated to the point where he could only perform limited consultation.

■■ We cannot agree with the above interpretation of the contract's provisions because there is nothing in the document that indicates a different rate of compensation for the consulting services rendered pursuant to paragraph 6 as opposed to paragraph 3. Whether Ross ceased to perform full-time under the contract because of his health or because Circle closed its downtown offices, the contract specifies only one salary cut of $10,000 from the full-time to consultant status. Hence, because paragraph 6 expressly incorporates the compensation rate for consulting services included in paragraph 3, we must follow the necessary import of paragraph 3. As the language itself indicates, Ross could be compensated at only one of the following rates: (1) $35,000 (full-time for the first 5 years of service); (2) $40,000 (full-time rate for service after 5 years); (3) $25,000 (consultant rate based on $10,000 reduction from $35,000); (4) $30,000 (consultant rate based on $10,000 reduction from $40,000); or (5) $15,000 (payment if Ross is totally incapacitated). These figures are specifically listed in paragraph 3, and we believe that no other levels of compensation were contemplated in the contract. Therefore, construing the document as a whole and attempting to give effect to the provisions as they relate to each other, we hold that the proper rate of Ross' compensation under the contract is $30,000 per year. See *Martindell v. Lake Shore National Bank* (1958), 15 Ill. 2d 272, 154 N.E.2d 683.

For the reasons herein set forth we affirm the trial court's judgment that defendant Ross did not materially breach the employment contract but modify the amount of compensation to be paid Ross from $20,000 to $30,000 per year.

Affirmed as modified.

LORENZ and MEJDA, JJ., concur.