C.L. MADDOX, INCORPORATED, Plaintiff–Appellant,

v.

COALFIELD SERVICES, INCORPORATED, Defendant–Appellee.

No. 94–2613.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 8, 1995.

Decided March 22, 1995.

---

Before POSNER, Chief Judge, RIPPLE, Circuit Judge, and NORGLE, District Judge.*

POSNER, Chief Judge.

The plaintiff, C.L. Maddox, Inc., had on January 18, 1991, made a contract with Zeigler/Old Ben Coal Company that required Maddox to demolish a loading facility in one of the coal company's mines, haul the demolished steel structure to the surface, fabricate a new loading facility for installation underground in the place of the demolished one, and install the new facility. Maddox decided to subcontract all of the job but the fabrication of the new facility. It asked the defendant, Coalfield Services, Inc., whether it would be interested in the subcontract. In February 1991, Coalfield's president met with Maddox's president for a few hours at the site of the mine, and at the end of the meeting he offered to do the job for $230,000. He didn't think it necessary to go underground and inspect the facility, because Coalfield had done this sort of work before. He was confident that, provided his crew was allowed to work around the clock, he could do the job in three weeks, as Maddox wished because of its commitments to Zeigler/Old Ben.

Coalfield's crew traveled to the mine on March 19 and on the same day Coalfield faxed a proposed contract to Maddox. The contract specified a price of $230,000 and completion within three weeks, provided that Coalfield was allowed to work day and night seven days a week. It also required biweekly progress payments based on Coalfield's progress toward completion. There are other provisions but they are of a boilerplate character immaterial to this appeal. Maddox's president called Coalfield's president the same day, requesting the inclusion of a noncompetition clause; this was done by return fax and Maddox's president told Coalfield's president that he would sign the proposal as amended. He never did.

Donald V. Ferrell, Thomas J. Foster (argued), Jelliffe, Ferrell & Morris, Harrisburg, IL, for plaintiff-appellant.

Thomas F. Crosby (argued), John S. Brewster, Winters, Brewster, Murphy, Crosby & Patchett, Marion, IL, for defendant-appellee.

* Hon. Charles R. Norgle, Sr., U.S. District Judge for the Northern District of Illinois, sitting by designation.

Coalfield's crew began work the next day, March 20. The crew encountered some difficulties in the work and, as the days passed, made slower progress than expected. Coalfield meanwhile was making repeated requests to Maddox to sign the proposal, receiving no replies, and getting nervous. Early in the morning of April 8, Coalfield ordered its crew to stop work and come to the surface with its tools and equipment. A few hours later it faxed Maddox a letter stating that it would not proceed with the work without acceptance by Maddox of the proposed contract and payment of an invoice for $103,500 enclosed with the letter. This was 45 percent of the contract price; Coalfield claimed that its crew was 45 percent of the way to completion of the job.

Maddox replied by fax the same day. Mr. Maddox was apologetic about not having responded to the proposed contract sooner. He said that although according to information he had received from his project superintendent "your 45% completion is a little high, ... we shall in good faith accept the 45% completion figure and pay accordingly less 10% retention." But he appeared to condition this promise on Coalfield's signing an "acceptance letter" that Maddox enclosed. (And there is evidence that Mr. Maddox told Coalfield's president this in a phone conversation.) That letter agreed to most of the provisions in Coalfield's proposal of March 19 but extended the deadline for completion of the work from three weeks to four in recognition of the fact that the crew had not been permitted to work on Sundays after all (because of "union disgruntlement," according to Coalfield's lawyer). Of much greater significance it added a liquidated-damages clause requiring Coalfield to pay Maddox $1,000 for every day that the job took beyond the four-week deadline. Coalfield balked. It had been working for three weeks already and the job was less than half finished. It estimated that completion would take another five or six weeks, which is to say four or five weeks beyond the new deadline fixed by Maddox, implying a potential liability for liquidated damages of $35,000 if it agreed to Maddox's terms. Coalfield faxed a letter back to Maddox on April 8 rejecting the acceptance letter and refusing to complete

the project unless Maddox not only paid the $103,500 invoice but also accepted the terms in Coalfield's offer of May 19, with an exception for the date of completion. "The original schedule can not be met due to work stoppages and delays beyond our control, and also because of the unexpected thickness of liners in existing equipment and bins. With no additional delays, the project will take approximately five (5) to six (6) weeks." The letter implicitly acknowledges that Coalfield's action in removing the crew from the underground work site would cause a further delay, for it reads, "if you decide to accept the above conditions, we will proceed with work starting April 16, 1991"—eight days from the date of the fax.

Maddox replied that if Coalfield did not resume work by April 9, it would be in breach of their contract. Coalfield never resumed the work, and Maddox brought this suit, a diversity suit governed by the contract law of Illinois, for the damages it incurred when, Coalfield having abandoned the job midway to completion, Maddox had to pay to have it completed by another contractor in time to avoid a breach of its contract with Zeigler/Old Ben. Coalfield counterclaimed for the contract price multiplied by the fraction of the job that it had completed, the $103,500 (.45 × $230,000).

Both parties moved for summary judgment. Coalfield's motion was based on the surprising ground that it had had no contract with Maddox. The district judge granted Maddox's motion for summary judgment and denied Coalfield's. It held that there had been a contract, as shown by Coalfield's action in performing for three weeks and completing, as it conceded it had, 45 percent of the project, and that Coalfield had broken the contract by walking off the job on April 8. The judge directed Maddox to submit documentation of its damages for Coalfield's breach. Later the judge changed his mind and agreed with Coalfield that he had jumped the gun in deciding that Coalfield had been the one to break the contract. The parties then consented to try the issue before a magistrate judge, who after a bench trial found that Maddox, not Coalfield, had broken the contract. Concerning damages for this

breach, the magistrate judge considered himself bound by what he considered to be the finding already made by the district judge that Coalfield had completed 45 percent of the work. He therefore awarded Coalfield the $103,500 that it was seeking for its partial performance of the contract.

■ Maddox rightly excepts to the magistrate judge's considering himself bound by the district judge's "finding" that the job had been 45 percent completed. It was an assumption rather than a finding. No *evidence* had been presented that Coalfield had completed 45 percent of the job. There was just Coalfield's concession to that effect, wrested from it during its futile effort to deny the existence of a contract, a concession that ought not bind Maddox. Actually there was *some* evidence—Maddox's first fax on April 8, in which it agreed to make a 45 percent progress payment (less 10 percent in case the 45 percent estimate turned out to be too optimistic). But this might have been in the nature of a compromise offer, designed to elicit Coalfield's agreement to the new terms in the acceptance letter; or it might have been a mistake. The essential point is that the question of how far Coalfield's work had progressed had not been litigated or determined. It is true that if Maddox in the summary judgment proceeding had used Coalfield's "concession" to establish the existence of a contract, a subsequent attempt to challenge the concession might run afoul of the doctrine of "mend the hold," which limits the right of a party to a contract to take inconsistent positions during the course of litigation over the contract. *Harbor Ins. Co. v. Continental Bank Corp.,* 922 F.2d 357, 362–65 (7th Cir.1990). But Maddox had not done that.

All this would be of no importance if Maddox were correct that not it but Coalfield broke the contract; let us see. To make our analysis intelligible, we have to revisit briefly the question whether there *was* a contract, although we do not understand either party to be denying anymore that there was. The presidents of the two companies agreed that Coalfield would do the job for $230,000 in three weeks, and Coalfield got to work and had completed a substantial part of the performance when the dispute arose. Was this oral agreement enforceable? Coalfield's partial performance took the contract out of the statute of frauds. *Monetti S.p.A. v. Anchor Hocking Corp.,* 931 F.2d 1178, 1183 (7th Cir. 1991). Any suggestion that the parties did not intend it to be a contract, intended rather that no legally enforceable obligations arise until the parties reduced their oral agreement to writing, *Quake Construction, Inc. v. American Airlines, Inc.,* 141 Ill.2d 281, 152 Ill.Dec. 308, 312, 565 N.E.2d 990, 994 (1990); *Chicago Investment Corp. v. Dolins,* 107 Ill.2d 120, 89 Ill.Dec. 869, 872, 481 N.E.2d 712, 715 (1985), is rendered implausible by the fact that Mr. Maddox had said he would sign Coalfield's proposal, implying agreement to the terms set forth in it. Coalfield's performing a substantial part of its contractual undertaking was further evidence that the parties had a contract, as it is hardly plausible that Coalfield would have done so much work, or Maddox permitted it to do so much work, had the parties not thought there was a contract. *McClellan v. Banc Midwest,* 164 Ill.App.3d 304, 115 Ill.Dec. 351, 354, 517 N.E.2d 762, 765 (1987); *Carrico v. Delp,* 141 Ill.App.3d 684, 95 Ill.Dec. 880, 883, 490 N.E.2d 972, 975 (1986). Neither party argues that the oral agreement was too vague to be enforced—that essential terms are missing. *Champaign National Bank v. Landers Seed Co.,* 165 Ill.App.3d 1090, 116 Ill. Dec. 742, 744–45, 519 N.E.2d 957, 959–60 (1988); *McClellan v. Banc Midwest, supra,* 115 Ill.Dec. at 354, 517 N.E.2d at 765; *Goldstick v. ICM Realty,* 788 F.2d 456, 461 (7th Cir.1986) (interpreting Illinois law); *Hyman Freightways v. Carolina Freight Carriers Corp.,* 942 F.2d 500, 503 (8th Cir.1991) (same). Such an argument would be hollow. Maddox's expressed willingness to sign Coalfield's proposal plugged the gaps in the oral agreement.

■ By suspending work on April 8, before the job was finished, Coalfield broke the contract—unless the suspension was a legitimate self-help response to a breach or threatened breach by Maddox. The magistrate judge thought it was, thought that Maddox had committed a breach that consisted of failing to make any of the biweekly

progress payments required by the proposal that Mr. Maddox had promised to sign. Yet Coalfield's first invoice was sent to Maddox after Coalfield stopped work, and since the progress payments were based on the percentage of work completed Maddox could hardly be expected to pay before Coalfield informed it of the progress of the work. (Anyway Coalfield had been working for barely two weeks when it invoiced Maddox.) The same timing problem afflicts Coalfield's argument that the stoppage was also justified by Maddox's insistence on a liquidated-damages clause. It would have been justified had the insistence preceded the stoppage. See *REA Express, Inc. v. Interway Corp.*, 538 F.2d 953, 955 (2d Cir.1976); 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 8.21, p. 477 (1990). But the sequence was reversed.

■ To get around the issue of timing, Coalfield argues that there was no stoppage on April 8. It had merely brought its crew to the surface. It could have put them back to work. Stopping work for just a few hours was not a breach of its duty to perform; abandonment came later, after Maddox's bombshell. Yet Coalfield's second fax announced that even if Maddox accepted all its demands it would not resume work for eight days. We infer that bringing the crew and all its tools and equipment to the surface was a substantial interruption in Coalfield's work and probably, since Coalfield knew that Maddox was in a hurry for the job to be completed, a substantial enough interruption to constitute a breach of contract, unless excused by Maddox's own breach or anticipatory repudiation.

■ We think the stoppage *was* excused. Maddox's refusal for three weeks to sign Coalfield's proposal, or even to send an acceptance with nonconforming terms, or even just to respond *somehow* to Coalfield's repeated demands rather than simply ignore them, gave Coalfield substantial grounds for interrupting its work in order to avoid running up additional costs without any assurance of payment. We must remember that Coalfield was working under an oral contract with many omitted terms, because Mr. Maddox might deny that he had phoned his ac-

ceptance of the terms in Coalfield's written proposal. Every day that Coalfield continued working, it put itself further in Maddox's power. Had it finished the job it would have found itself owed $230,000 with no leverage over Maddox to extract the money short of a suit to enforce what, depending on Mr. Maddox's testimony and its reception by a jury, might be merely a vague oral contract. Coalfield's good judgment in pausing—the reasonableness of its suspicion that Maddox had no intention of complying with the oral agreement—was shortly vindicated by Maddox's demand for a liquidated-damages clause. So unlikely was the clause to be accepted, given the virtual certainty that Coalfield would not be able to finish the job in four weeks, that the most plausible interpretation of Maddox's action is that it was seeking excuses for not paying Coalfield anything. Our reaction might be different if liquidated-damages clauses were standard in the industry, but there is no evidence that they are.

We do not suggest that the proposal of a liquidated-damages clause was itself a breach of contract. Even the written proposal for the contract which Coalfield had sent Maddox had been sketchy; there were many open terms. Maddox was free to ask for whatever terms it liked even though, since the parties already had a contract, Coalfield was not obligated to accept any of Maddox's proposals. Nor do we suggest that Coalfield could justify the stoppage on the basis of events that happened later. It is merely that those events are evidence that the earlier suspicions that precipitated the stoppage were indeed reasonable.

In a contract governed by the Uniform Commercial Code (which this one was not, *Althoff Industries, Inc. v. Elgin Medical Center, Inc.*, 95 Ill.App.3d 517, 51 Ill.Dec. 386, 400–01, 420 N.E.2d 800, 804–05 (1981)), Coalfield's self-help remedy would have been to demand assurances of performance (in this case of payment). UCC § 2–609; *Chronister Oil Co. v. Unocal Refining & Marketing*, 34 F.3d 462, 464 (7th Cir.1994), and cases cited there. The principle of section 2–609 is generalized to all contracts in section 251 of the *Restatement (Second) of Contracts* (1981). See 2 Farnsworth, *supra*, §§ 8.23, 8.23a, pp.

491–95. The *Restatement* of course is not law, and we cannot find any Illinois cases discussing section 251. But the principle strikes us as a sound one, and we have no reason to doubt that it would be so regarded by the courts of Illinois. Its applicability here is straightforward. Coalfield's repeated requests to Maddox to sign a proposal that, so far as the record shows, contained no unusual, coercive, or one-sided terms—a proposal that could not be said to *invite* rejection or a counter-proposal—were in effect reasonable requests for assurances, or close enough to be treated the same by the law. Maddox's failure to provide any assurances entitled Coalfield in the circumstances that we have outlined (Maddox's failure to make any response to Coalfield's requests for confirmation, the vagueness of the parties' contract, and the fact that Coalfield was running up a greater and greater expense without receiving any progress payments to offset it) to anticipate that Maddox would commit a breach, to suspend its own performance for the sake of self-protection, and to demand payment for the work done to date. *B & C Electric, Inc. v. Pullman Bank & Trust Co.,* 96 Ill.App.3d 321, 51 Ill.Dec. 698, 703, 421 N.E.2d 206, 211 (1981); *First National Bank v. Continental Illinois National Bank,* 933 F.2d 466, 469 (7th Cir.1991) (interpreting Illinois law). Coalfield would have been imprudent to continue working with no assurance of payment.

Against this it can be argued that since the parties already had a contract, Coalfield need not have required Mr. Maddox to sign anything and therefore did not have to worry about his failure to respond to the repeated demands to sign Coalfield's written offer, and could treat Maddox's counteroffer as a request for modification and ignore it. But the doctrine of anticipatory breach *presupposes* that the parties have a contract, and entitles a party to walk away from the contract once the other party has manifested an intention of breaking it. The walking away is a (self-help) remedy for the (anticipated) breach.

We are mindful of the standard formula, illustrated in Illinois by *In re Marriage of Olsen,* 124 Ill.2d 19, 123 Ill.Dec. 980, 983, 528 N.E.2d 684, 687 (1988); *Draper v. Frontier*

*Ins. Co.,* 265 Ill.App.3d 739, 203 Ill.Dec. 50, 55, 638 N.E.2d 1176, 1181 (1994); *Farwell Construction Co. v. Ticktin,* 84 Ill.App.3d 791, 39 Ill.Dec. 916, 925, 405 N.E.2d 1051, 1060 (1980), and *B & C Electric, Inc. v. Pullman Bank & Trust Co., supra,* 51 Ill. Dec. at 703, 421 N.E.2d at 211, that an anticipatory breach occurs only when a party makes a clear and unequivocal statement of his intention to break the contract when his performance comes due—a statement "sufficiently positive to be reasonably understood as meaning that the breach will actually occur." 2 Farnsworth, *supra,* § 8.21, p. 475. We have no quarrel with the formula. But obviously it is meant for cases in which the claim of anticipatory repudiation is based on a statement. Here, as in cases based on section 2–609 of the Uniform Commercial Code, the claim is based on silence in the face of a request for the equivalent of assurances. We find nothing in the cases to suggest that a party who, having begun to perform his side of an incompletely specified contract and begun to incur substantial costs in doing so, develops a reasonable basis (indeed one shown in retrospect to have been correct) for thinking the other party to the contract will not perform may not act on that knowledge and cut its losses. By the time Coalfield brought its crew to the surface, Maddox had repeatedly failed to respond to Coalfield's demand for confirmation of their agreement. Had Coalfield not acted and instead had completed the job and sued, it might have been faced with a defense of failure to mitigate its damages.

Maddox hints at an argument that Coalfield broke the contract by failing to complete performance within three weeks. The implication is that Coalfield used Maddox's failure to sign the proposal as a pretext to walk off a job that it could not complete at a profit because it had underestimated the difficulties. It is not a bad argument, *Circle Security Agency, Inc. v. Ross,* 107 Ill.App.3d 195, 63 Ill.Dec. 18, 23, 437 N.E.2d 667, 672 (1982); *Casio, Inc. v. S.M. & R. Co.,* 755 F.2d 528, 532 (7th Cir.1985) (interpreting Illinois law), but it is insufficiently developed to justify a reversal. We do not know whether the agreement required completion within three weeks or merely estimated completion within

that time. Coalfield's proposal was vague: "Schedule to provide for installation within three (3) weeks if allowed to work 7 days per week around the clock." And if this *was* a commitment to completion within three weeks, it was only a conditional commitment, and one of the conditions—being allowed to work seven days a week—was not fulfilled. Contractors naturally are reluctant to make unconditional commitments to complete construction projects by a specified date, and while this is also the reason a contractor's customer may want a liquidated damages clause, it appears that Maddox was acting opportunistically in demanding one at a time when it was plain that Coalfield could not complete performance in time to avoid triggering the clause. And we do not know what excuses in the nature of impossibility, impracticability, or frustration Coalfield might have had available to it in the circumstances.

We agree with the magistrate judge that Maddox was the only contract breaker, but for reasons discussed earlier Coalfield's damages must be redetermined.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.