R. E. PUCKETT *et al.*, Plaintiffs-Appellees, v. ELMER OELZE, JR., Defendant-Appellant (Ashland Oil, Inc., Defendant).

Fifth District No. 5—84—0128

Opinion filed July 12, 1985.

Donald Bigham, of Hohlt, House, DeMoss & Johnson, of Pinckneyville, for appellant.

A. Ben Mitchell and L. James Hanson, both of Musick & Mitchell, of Mt. Vernon, for appellees.

PRESIDING JUSTICE JONES delivered the opinion of the court:

In this appeal we are asked by defendant-appellant Oelze to construe a farmout agreement of an oil and gas lease. Defendant contends here, as he did before the trial court, that State-mandated oil well spacing requirements create a latent ambiguity in the agreement

that calls for evidence to show the true intention of the parties. The trial court found no such latent ambiguity and entered a final order for the plaintiffs. We affirm.

The plaintiffs are three brothers, R. E. Puckett, Thomas Puckett and Ferrell Puckett. Prior to October 28, 1980, the parents of the plaintiffs, Leo and Ruth Puckett, owned one-fourth of the oil, gas and other mineral rights underlying 50 acres of land in Jefferson County that included 10 acres described as the south one-half of the south one-half of the northwest quarter of the southeast quarter of section 23, township 3 south, range 2 east of the 3d P.M. On October 28, 1980, the plaintiffs' parents, as lessors, executed an oil and gas lease upon the 50 acres in favor of plaintiff R. E. Puckett. The lease provided for a royalty of one-eighth. The next day, October 29, 1980, plaintiffs' parents, as grantors, executed a quit-claim deed whereby they conveyed to the three plaintiffs, in equal portions, their one-fourth interest in the oil, gas and other minerals in the 50 acres. We note parenthetically that neither plaintiffs nor defendant raise any question or pose any issue that might arise because of the doctrine of merger of title; consequently, we give no consideration to it.

On October 30, 1980, plaintiff R. E. Puckett, then the lessee and sole owner of the oil and gas lease of October 28, 1980, prepared, dated, signed and forwarded to Oelze the farmout agreement on the oil and gas lease. It provided that:

> "Oelze agrees that on or before January 29, 1981, he will commence or cause to be commenced, the actual drilling of a Test Well, for oil and gas, at a location in the S½ S½ NW¼ SE¼ of Section 23, Township 3 South, Range 2 East, 3rd P.M., Jefferson County, Illinois, which said Test Well shall thereafter be drilled in a good and workmanlike manner to a depth of 2800 feet or a depth sufficient to adequately test the McClosky Formation, whichever is lesser, herein called 'Contract Depth,' also sometimes herein called 'Casing Point,' Said Test Well shall be drilled to Contract Depth, plugged and abandoned if dry, at the sole cost, risk and expense of Oelze."

Section II of the agreement provided as follows:

> "At such time as said Test Well reaches Contract Depth or Casing Point and is not plugged and abandoned as a dry hole:
>
> A. Puckett shall assign to Oelze an undivided one-half of his right, title and interest in and to said Lease, but only as to those depths, zones and Formations from the surface of the ground to the base of the McClosky Formation.
>
> B. Simultaneously with the assignment in A above, it is

understood that Puckett is the owner of *an undivided ⅛ Working Interest in said Test Well, the spacing unit on which said Test Well is located, leases, lands and equipment connected therewith.*" (Emphasis added.)

At the time R. E. Puckett executed the farmout agreement, Oelze held oil and gas leases on the remaining three-fourths interest in the oil and gas underlying the Puckett 50 acres as well as an oil and gas lease to all of the interest in the north one-half of the south one-half of the northwest quarter of the southeast quarter of section 23, 10 acres. This latter 10-acre tract combined with the 10-acre tract from the Puckett 50 acres to comprise the south one-half of the northwest quarter of the southeast quarter of section 23, 20 acres.

On November 5, 1980, the State issued a drilling permit to Oelze entitling him to drill a well 330 feet north and 330 feet east of the southwest corner of the northwest quarter of the southeast quarter of section 23. The well required a 20-acre spacing unit, and that 20-acre spacing unit was comprised of the described 10 acres from the Puckett lease and the described 10 acres held by Oelze. Shortly after the permit was issued, Oelze drilled a well and it proved to be commercially productive. The production was sold to the defendant Ashland Oil, Inc., which appears in this case as a mere stakeholder and will not be further mentioned.

On November 14, 1980, R. E. Puckett assigned to each of his two brothers, Thomas and Ferrell Puckett, a one-third interest in the oil and gas lease dated October 28, 1980. The assignment noted that it was subject to the terms of the October 30, 1980, farmout agreement with Oelze. On November 28, 1980, after drilling operations had been completed, Oelze signed the farmout agreement. Apprised that the well was a producing one, the plaintiffs, on December 19, 1980, assigned to Oelze an undivided one-half interest in the oil and gas lease dated October 28, 1980, from Leo and Ruth Puckett,

"[b]ut only as to those depths, zones and Formations from the surface of the ground down to the base of the McClosky Formation, as provided in Section II, A of Farmout Agreement between R. E. Puckett and Elmer Oelze, Jr. dated October 30, 198[0.] This Assignment is also made pursuant to and subject to the provisions of Section II, B and Section II, C of said Farmout Agreement."

A dispute arose concerning the fractional working interest share the plaintiffs were to receive pursuant to the farmout agreement. Apparently a proposed division order from Ashland Oil, Inc., had indicated that the plaintiffs were entitled to receive only an undivided

one-sixteenth working interest in the test well, whereas the plaintiffs claimed that they were to receive an undivided one-eighth working interest in it as stated expressly in the agreement between Oelze and R. E. Puckett. In November of 1981 the plaintiffs brought suit by filing a two-count complaint. The first count addressed the matter of their working interest in the well. The second count addressed their royalty interest, which they alleged to be one-quarter of the one-eighth royalty interest in crude oil proceeds. The dispute concerning the amount of the plaintiffs' royalty interest appears, likewise, to have arisen with the submission by Ashland Oil, Inc., of the proposed division order, which indicated that the plaintiffs were entitled not to one-fourth but to one-eighth of the one-eighth royalty interest. The plaintiffs alleged further that they, as owners of one-half of the lessee interest in the oil and gas lease of October 28, 1980, had neither executed nor authorized to be executed any declaration of pooling. On September 10, 1982, Oelze executed a declaration of pooling of oil and gas leases, including the 50 acres described in the lease of October 28, 1980, from Leo and Ruth Puckett.

On January 24 and 26, 1983, a bench trial was conducted. The testimony showed that both Oelze and R. E. Puckett have had considerable experience in the oil production business. Oelze stated that he has been an "[o]il producer" full-time since 1962. R. E. Puckett said that he has been in the "oil and gas producing business" for 31 years. Oelze testified that he had drilled 46 wells in 1982 and 50 in 1981. Concerning spacing requirements in the State of Illinois, R. E. Puckett, whose office is in Denver, Colorado, stated that although he did not know the "exact clause" with regard to spacing requirements of the State of Illinois, he was "aware that they [sic] probably had some." He denied that at the time the agreement was entered into there had been any discussion of pooling of the 10 acres to the north with the 10 acres on which the test well was to be drilled. A member of R. E. Puckett's office staff had prepared the agreement. Oelze testified that he had telephoned R. E. Puckett on September 22, 1980,

> "to talk to him about drilling the well on the location we just talked about and I told him that I have three-fourths of the minerals leased under this 50 acres and the acreage immediately north of the 10 acres where the well is located and that I needed his acreage for minerals to complete this to drill a well and I also explained to him that Illinois regulations [sic] you have to have 20 acres to drill the limestone well."

Oelze testified further that on October 15, 1980, he had telephoned R. E. Puckett concerning the location of the proposed well:

"I told Mr. Puckett most likely spot to get a well would be at this particular location and to do that it would have to be pooled or unitized according to the State regulations."

The thrust of Oelze's argument in the trial court, as here, was that the State's 20-acre spacing requirement interjected a latent ambiguity into the agreement between him and R. E. Puckett, so that, although the agreement on its face may appear clear and unambiguous, according to Oelze, it is not. Oelze maintained that this latent ambiguity rendered the agreement ambiguous as to whether the plaintiffs were to receive a one-eighth working interest in 10 of the 20 acres comprising the unit, which was Oelze's position, or a one-eighth working interest in the entire 20 acres. The plaintiffs contended that the agreement was not ambiguous and that they were entitled to receive a one-eighth working interest in the entire 20 acres comprising the drilling or spacing unit.

The trial court found and provided in its order that the plaintiffs were owners of an undivided one-eighth working interest in and to the test well drilled pursuant to the agreement between Oelze and R. E. Puckett and that the plaintiffs are consequently entitled to one-eighth of seven-eighths of the total value of crude oil produced and sold from the test well. The court further found and provided in its order that the plaintiffs owned one-fourth of the oil and gas underlying the south half of the 20 acres contained in the drilling unit and, thus, are entitled to one-eighth of the one-eighth royalty interest provided in the lease from Leo and Ruth Puckett to R. E. Puckett, that is, to one-eighth of one-eighth of the total value of crude oil produced and sold from the test well. Following a hearing the trial court denied the defendant Oelze's post-trial motion, and Oelze has appealed only that part of the judgment bearing on the plaintiffs' working interest in the test well. The plaintiffs have not appealed that part of the judgment concerning their royalty interest in the test well.

On appeal the defendant Oelze raises two issues, which we quote:

"1. Whether the trial court erred in construing an ambiguous written agreement of the parties in determining Plaintiffs' working interest in the oil well drilled by Defendant Oelze.

2. Whether the trial court erred in granting Plaintiffs' [*sic*] a working interest which did not represent their proportional working interest ownership in the oil well drilling unit."

■■ ■ In construing a contract, the determinative factor is to effect the intent of the parties, and where the terms of the contract are plain and unambiguous, the intent of the parties must be ascertained solely from the words employed in the contract. (*AZL Resources, Inc.*

*v. Bromagen* (1979), 79 Ill. App. 3d 76, 398 N.E.2d 292.) If the language of the contract makes the meaning of the contract plain and unambiguous, the court has no necessity to resort to rules of construction to assist it. (*Fox v. Inter-State Assurance Co.* (1980), 84 Ill. App. 3d 512, 405 N.E.2d 873.) In the case at bar, we think, as did the trial court, that the language of the contract is plain and the meaning unambiguous.

As we have already stated, the agreement between Oelze and R. E. Puckett specified that "Puckett is the owner of an undivided 1/8 Working Interest in said Test Well, the spacing unit on which said Test Well is located, leases, lands and equipment connected therewith." Section 1 of "An Act in relation to oil, gas, coal and other surface and underground resources" provided definitions for several terms pertinent to the Act, including "drilling unit," which is defined as "the surface area allocated by an order or regulation of the Mining Board to the drilling of a single well for the production of oil or gas from an individual pool." (Ill. Rev. Stat., 1983 Supp., ch. 96½, par. 5401.) In 1A W. Summers, The Law of Oil & Gas sec. 104, at 148 (1954), the author states:

> "Many states now have statutes authorizing their respective oil and gas conservation agencies to establish oil and gas *drilling or spacing units. Such a unit is defined as being an area which may be efficiently and economically drained by one well located in the approximate center thereof.*" (Emphasis added.)

In the production of oil and gas the term "drilling unit" or "spacing unit" is a term of art, the meaning of which is highly specific and commonly understood by those engaged in such production.

■ In the instant case neither party to the agreement was a newcomer to the oil and gas business; rather, each testified to long experience in it. The testimony of both Oelze and Puckett indicates their familiarity with the requirement of a drilling or spacing unit. Unlike Puckett, Oelze indicated a familiarity with the requisite spacing units in Illinois, at one time describing the process for applying to drill a well:

> "First I have a licensed surveyor stake the location and we have a form that he fills out which is an application to drill, deepen or convert a well. Then I take that application to Springfield or mail it which this one I took personally and in this particular case I took copies of the leases that were involved to show that they had the pooling agreement or clause which is a requirement of the State."

Later Oelze testified that he had told Puckett about the State require-

ment concerning pooling "because as long as I have been in it I know what I have to do before I go up there [to Springfield to apply for a drilling permit]." Oelze's testimony as quoted here and earlier in this opinion suggests that he knew the spacing unit would be comprised of the 20 acres in question although some of Puckett's testimony during cross-examination indicates that he thought the spacing unit would consist of 10, not 20, acres. Whatever the understanding of the parties as to the actual acreage of this particular spacing unit, however, they appear to have well understood the meaning of the term. More importantly, the term is expressly included plainly and unambiguously in the series of units in which Puckett was to have an undivided one-eighth working interest. Had the agreement referred only to "Test Well" and made no mention of "spacing unit," a latent ambiguity might have existed. However, such is not the case. We agree with the trial court that the plaintiffs, by the express terms of the agreement, are entitled to an undivided one-eighth working interest in the entire 20-acre unit, that is, in the "spacing unit on which [the] Test Well is located."

■■ ■ In his brief, Oelze advances the argument that if the plaintiffs should receive an undivided one-eighth working interest in the 20-acre spacing unit, Oelze "as a prudent man or as an operator well experienced in the oil business" would not have entered into such an agreement. Even if this were so—and we note parenthetically that Oelze did receive one-half of Puckett's interest in not just 10 but in all 50 acres of the lease of October 28, 1980—the argument is not persuasive inasmuch as this was a commercial transaction concluded by a process of bargaining, and we decline to weigh the question of which party made the better bargain.

Affirmed.

KARNS and KASSERMAN, JJ., concur.