Barbara W. WIKOFF, Individually and as Executrix of the Estate of John W. Wikoff, Plaintiff–Appellee,

v.

John VANDERVELD, Jr., Defendant–Appellant.

Nos. 88–3520, 89–1663.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 12, 1989.

Decided March 1, 1990.

As Corrected May 9, 1990.

Michael A. Stick, Ronald Butler, Kevin J. O'Brien, Butler, Rubin, Newcomer, Saltarelli & Boyd, Chicago, Ill., for plaintiff-appellee.

Michael J. Zdeb, Stephen G. Seliger, Joel M. Hellman, Chicago, Ill., for defendant-appellant.

Before CUMMINGS, WOOD, Jr., and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

Defendant-appellant John Vanderveld, Jr., appeals the judgment of the district court finding him liable to the plaintiff-appellee Barbara Wikoff in the amount of $360,671.95 in Wikoff's action enforcing a personal guaranty executed by Vanderveld at the time his corporation, Vanderveld, Inc. ("VandInc"), purchased Wikoff's business, MSCI, Ltd. ("MSCI"). We reverse and remand for specific factual findings as to the questions of whether Wikoff breached her warranties to VandInc and whether Vanderveld's breach of warranty defense, if any, has been waived.

### I.

Barbara Wikoff became the sole owner of MSCI, a manufacturer and distributor of industrial chemicals, in December 1984, when her husband John, the founder of the company, passed away. Because she had little knowledge of MSCI's business, Wikoff sought to sell the company shortly after her husband's death. In late December 1984, Wikoff and her advisers at MSCI entered into preliminary negotiations with VandInc preparatory to purchasing the company through the acquisition of Wikoff's MSCI stock. On January 23, 1985, VandInc submitted a letter of intent to purchase all of Wikoff's MSCI stock contingent upon the receipt of a satisfactory investigation report regarding the financial condition of the company. Pursuant to the condition of VandInc's letter of intent, Vanderveld's son Ronald and William Young conducted an investigation of MSCI on behalf of VandInc during which they had full access to the employees, business records and production schedules in MSCI's principal office and plant in Chicago, Illinois, as well as its production plant in Union City, California. As part of their investigation, Ronald Vanderveld and Young interviewed MSCI employees, reviewed contracts, bids, operating permits and product formulas, and monitored the company's production and marketing operations.

On March 29, 1985, VandInc executed a stock purchase agreement with Wikoff under which Wikoff agreed to sell her MSCI stock to VandInc for $750,000. Wikoff also agreed to allow VandInc to continue its investigation of MSCI and actively participate in the day-to-day management of the company until closing. Further, in Article III of the agreement, Wikoff warranted that MSCI's financial statements were complete and correct and prepared in accordance with generally accepted accounting principles. Further, Wikoff warranted that there had been no material change in MSCI's financial condition, assets and liabilities since September 30, 1984, except as reflected in the financial statements. The agreement also reiterated that VandInc's obligation to purchase Wikoff's stock was conditioned upon VandInc's determination that all of MSCI's liabilities were represented in the financial statements and that no undisclosed or contingent liabilities not previously disclosed to VandInc existed. After signing the stock purchase agreement, Wikoff largely reduced her involvement in the management of MSCI, relinquishing control of the company's day-to-day operations to the agents of VandInc.

On May 13, 1985, the parties agreed to reduce the purchase price of Wikoff's shares from $750,000 to $690,000. Pursuant to this agreement, Wikoff transferred all of her MSCI shares to VandInc and, in return, VandInc executed a promissory note to Wikoff for $690,000. On July 29, 1985, the parties closed the sale of Wikoff's stock pursuant to a "Modification Agree-

ment" amending the stock purchase agreement. Under the terms of the modification agreement the parties further reduced the stock purchase price to $500,000. Specifically, Wikoff agreed to cancel VandInc's May 13 note for $690,000 and, in lieu thereof, receive a cash payment of $300,000 and MSCI's promissory note for $180,000.[1] The note called for interest of 10 percent per year payable in monthly installments from August 1985 to July 1986. The $180,000 principal amount was due and payable on August 2, 1986. As security for the note, Wikoff received, among others, the personal guaranty of John Vanderveld, under which Vanderveld "severally, unconditionally and irrevocably" guarantied all amounts due under the MSCI note and, further, agreed "to pay all expenses including reasonable attorneys' fees incurred by [Wikoff] in collecting such obligations and enforcing the guarantee."

MSCI made interest payments on the note through June 1986. However, MSCI failed to make the final interest payment due in July 1986 and subsequently defaulted on the $180,000 principal payment due August 2, 1986. According to Vanderveld, MSCI refused to make these payments because it discovered that the operating permit for the company's plant in Union City, California, had expired pursuant to a local ordinance on March 9, 1985, and that the municipality would not grant a new permit until the plant created and implemented, subject to the approval of the Union City Fire Department ("UCFD"), a hazardous materials management plan ("HMMP").[2] In October 1985, John Wright, MSCI's Union City plant manager, submitted a proposed HMMP to UCFD, but the plan was rejected. Although the HMMP was not approved, UCFD allowed MSCI to continue operating the plant until March 1986 when, after a spill of hazardous waste occurred at the facility, the plant was closed for failure to implement a HMMP and operating without a permit. UCFD fire chief Joseph Perry stated in his deposition that, in accordance with UCFD's customary practice, the plant would not have been shut down had no spill occurred despite the fact that MSCI had failed to renew its operating permit. After the shut-down, MSCI solicited bids to create a HMMP to comply with the Union City ordinance. In his brief, Vanderveld alleges that the total cost of obtaining a HMMP was estimated to be in excess of $186,000. However, no HMMP was ever obtained by MSCI.

After MSCI's default, Wikoff made a written demand on Vanderveld to satisfy his guaranty of the note, but Vanderveld refused to honor his obligations thereunder. On September 15, 1986, Wikoff initiated this action seeking to enforce the terms of Vanderveld's guaranty. In his answer, Vanderveld raised the affirmative defense that he was not obligated to honor his guaranty because Wikoff had breached her warranties in the March 29 stock purchase agreement that MSCI's financial statements reflected all liabilities of the company. Specifically, Vanderveld alleged that the financial statements failed to disclose that the local operating permit for MSCI's plant in Union City, California, had expired on March 9, 1985, and that a new permit could not be obtained until the plant created and implemented a HMMP approved by UCFD, the cost of which was in excess of the sum MSCI owed Wikoff under the note and, consequently, the amount for which Vanderveld was liable under his guaranty.

A four-day bench trial commenced on September 19, 1988. The central issue was

1. In addition to the $300,000 cash payment and $180,000 note, the $500,000 purchase price included a $20,000 down payment which Wikoff received after executing the March 29 stock purchase agreement.

2. Union City enacted the ordinance requiring that each user of hazardous materials operating in the city implement a HMMP as a prerequisite to obtaining a municipal operating permit in December 1983. In March 1984, UCFD fire chief Joseph Perry, informed Jack Pagendarm, then manager of MSCI's Union City plant, of the ordinance and explained that MSCI was required to submit and obtain approval of a HMMP by March 9, 1985, in order to retain its operating permit. However, Pagendarm left MSCI in late 1984—thus, before Wikoff began negotiations with VandInc for the purchase of her MSCI stock.

whether Wikoff had breached her warranties concerning MSCI's financial statements and, if so, whether this breach relieved Vanderveld of his obligation to honor his guaranty. At trial, Vanderveld presented and the trial court certified Gerald DeNicholas, a partner in the accounting firm of DeLoit, Haskins & Sells, as an expert witness. DeNicholas, after reviewing MSCI's financial statements and other documents, testified that under generally accepted accounting principles MSCI's financial statements should have noted the lapse of the Union City plant's operating permit, as well as the requirement of obtaining a HMMP for renewing the permit. It is undisputed that the financial statements failed to make such a disclosure. On October 14, 1988, the district court rendered judgment in favor of Wikoff for $180,000 plus interest and determined that, under the terms of the guaranty, Wikoff was also entitled to an award of costs and attorneys' fees. On October 14, 1988, the district court rendered judgment in favor of Wikoff. In its findings of fact and conclusions of law, the court found that Wikoff's warranty as to the accuracy of MSCI's financial statements "was, if anything, under the circumstances of this case intended as a protection against deliberate concealment of liabilities [which] is not claimed and did not occur." The court further found that the periods of investigation and joint management were Vanderveld's primary safeguards under the stock purchase agreement and that the reason for these safeguards was Wikoff's lack of knowledge and expertise concerning the operation of MSCI. Based on this finding, the court concluded that VandInc had not relied on Wikoff's warranty and, thus, the warranty never became effective. The court also concluded that if a breach of Wikoff's warranty had occurred, it had been waived because MSCI, instead of notifying Wikoff of the lack of a HMMP and ceasing performance on the contract, continued to make interest payments after the lack of a HMMP was discovered, contrary to the past course of dealing between the parties.

On November 28, 1988, the district court entered judgment for Wikoff in the amount of $348,961.19 plus $65.55 per day (principal and interest), and also awarded Wikoff costs of $11,613.71 and attorneys' fees of $110,227.95. This judgment was entered on the docket on November 29, 1988. Because this judgment exceeded the amount to which Wikoff was entitled by approximately $100,000, Wikoff filed a motion to alter and amend the November 28 judgment pursuant to Fed.R.Civ.P. 59(e) on December 6, 1988. On that same day, the court, in a minute order, granted Wikoff's motion and amended the total judgment to $360,671.95 ($234,455.85 in principal and pre-judgment interest, $112,575.34 in attorneys' fees and non-statutory costs, $71,-613.71 in statutory costs and $2,032.05 in post-judgment interest). However, a separate judgment reflecting this amendment of judgment was not entered on the district court docket. On December 28, 1988, Vanderveld filed a notice of appeal in this court (No. 88–3520) "from the final judgment dated November 28, 1988, and entered on the docket November 29, 1988, and as corrected by the order dated December 6, 1988...." Some time thereafter, Vanderveld's attorney informed counsel for Wikoff that no judgment form had been entered for the December 6 amendment and that jurisdiction in this court was possibly lacking. On February 22, 1989, Wikoff moved the district court for entry of judgment *nunc pro tunc* to December 6, 1988. The district court, again by minute order, granted this motion over Vanderveld's objection on February 23, 1989. On March 27, 1989, Vanderveld filed a second notice of appeal (No. 89–1663) from the district court's February 23 order. As with the December 6 order, only the court's minute order was entered on the docket; a separate form of judgment was not entered.

On appeal Vanderveld maintains that the district court's grant of judgment for Wikoff was improper, arguing that: (1) the court misconstrued Wikoff's warranties as covering only deliberate concealments in MSCI's financial statements; (2) the court erred in determining that VandInc did not rely on Wikoff's warranties, thus rendering

them ineffective; and (3) the court erred in concluding that the breach of warranty defense had been waived because MSCI failed to notify Wikoff of the breach and continued making interest payments under the note until June 1986.

## II.

■ Before addressing the merits of Vanderveld's arguments, we must determine whether we have jurisdiction over his appeal. After filing his notices of appeal, Vanderveld filed a "Suggestion for Want of Jurisdiction" with this court claiming that jurisdiction is lacking in this case because the district court, in granting Wikoff's Rule 59 motion to amend judgment and amending the November 28 judgment, failed to set forth the amended judgment on a separate document and enter judgment on the docket in compliance with Fed.R.Civ.P. 58 [3] and 79(a).[4]

A notice of appeal in a civil case must be filed within 30 days of the entry of the judgment or order serving as the basis for the appeal. 28 U.S.C. § 2107; Fed.R. App.P. 4(a)(1). However, a timely motion for alteration or amendment of judgment under Fed.R.Civ.P. 59 stays the time for appeal until the order disposing of the motion is entered on the docket in compliance with Rules 58 and 79(a). Fed.R.App.P. 4(a)(4) & (6). Rule 58 requires that every judgment be set forth on a separate document, and Rule 79(a) details the civil docketing procedure to be followed by district court clerks in entering judgment. *Beaudry Motor Co. v. Abko Properties, Inc.*, 780 F.2d 751, 754 (9th Cir.), *cert. denied*, 479 U.S. 825, 107 S.Ct. 100, 93 L.Ed.2d 51

(1986). A notice of appeal filed before judgment is entered is a nullity, thus depriving the appellate court of jurisdiction over the appeal. *Acosta v. Louisiana Dept. of Health & Human Resources*, 478 U.S. 251, 252–53, 106 S.Ct. 2876, 2876–77, 92 L.Ed.2d 192 (1986).

It is undisputed that the district court's November 28 judgment for Wikoff was a final, appealable order and, furthermore, that it was set forth on a separate judgment form and entered on the docket. However, Wikoff's December 6 motion for amendment of judgment, filed pursuant to Rule 59(e), suspended the finality of the November 28 judgment until the entry of the order disposing of this motion. *Charles v. Daley*, 799 F.2d 343, 347 (7th Cir.1986). As noted above, on December 6, 1988, the district court granted Wikoff's motion and amended the original judgment in a minute order, which was entered on the docket the following day. This was insufficient to comply with the "separate judgment" requirement of Rule 58. "A minute order suffices when the judge denies a request to alter the judgment, for then the original judgment remains intact." *Id.* at 347. However, when the court grants a Rule 59(e) motion, thus rendering a "new judgment," Rule 58 requires that the new judgment be set forth on a separate document. *Id.* Vanderveld reasons that because the amended judgment was not set forth on a separate document, the judgment was not entered in accordance with Fed.R.App.P. 4(a) and his notice of appeal filed on December 28 was premature, thus depriving this court of jurisdiction over his appeal.[5]

---

**3.** Rule 58 provides in pertinent part:

"[U]pon a general verdict of a jury, or upon a decision by the court that a party shall recover only a sum certain or cost or that all relief shall be denied, the clerk, unless the court otherwise orders, shall forthwith prepare, sign, and enter the judgment without waiting any direction by the court.... Every judgment shall be set forth on a separate document. A judgment is effective only when so set forth and when entered as provided in Rule 79(a)."

**4.** Rule 79(a) provides in pertinent part:

"All papers filed with the clerk, all process issued and returns made thereon, all appearances, orders, verdicts and judgments shall be entered chronologically in the civil docket on the folio assigned to the action and shall be marked with its file number. These entries shall be brief but shall show the nature of each paper filed or writ issued and the substance of each order or judgment of the court and of the returns showing execution of process. The entry of an order or judgment shall show the date the entry is made."

**5.** As noted above, Vanderveld filed a second notice of appeal on March 27, 1989, in response

Vanderveld's reasoning overlooks the fact that in certain circumstances the separate document requirement of Rule 58 may be waived to "pave the way for appellate jurisdiction." *Rosser v. Chrysler Corp.,* 864 F.2d 1299, 1305 (7th Cir.1988). In *Bankers Trust Co. v. Mallis,* 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978), the Supreme Court recognized that the purpose of the separate document requirement is to clarify when the time for appeal begins to run and that this purpose is not furthered by premising appellate jurisdiction on the existence of a separate judgment:

> "If, by error, a separate judgment is not filed before a party appeals, nothing but delay would flow from requiring the court of appeals to dismiss the appeal. Upon dismissal, the district court would simply file and enter the separate judgment, from which a timely appeal would then be taken. Wheels would spin for no practical purpose.[ ]"

*Id.* at 384–85, 98 S.Ct. at 1120 (footnote omitted). After noting that the district court clearly intended the order appealed from to "represent the final decision in the case," that the order had been "recorded in the clerk's docket," and that the appellee "did not object to the taking of the appeal in the absence of a separate judgment," the Court held that these circumstances constitute a waiver of Rule 58's separate judgment requirement and, thus, that appellate jurisdiction in the absence thereof was proper. *Id.* at 387–88, 98 S.Ct. at 1121–22.

In the present case, the district court's December 6, 1988, minute order reads: "Plaintiff's motion [for amendment of judgment] is granted. Final judgment is amended as follows: Plaintiff is entitled to a total final judgment of $360,671.95...." In our opinion, the district court intended the minute order amending the judgment to represent the final decision in this case. The court explicitly refers to the "final judgment" of November 28, 1988, in granting Wikoff's motion for amendment of that judgment and also sets forth the "total

final judgment" to which she is now entitled. Thus, the court's order "end[ed] the litigation on the merits and [left] nothing for the court to do but execute the judgment." *See Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945); *Adams v. Lever Bros. Co.,* 874 F.2d 393, 394 (7th Cir.1989); *Rosser,* 864 F.2d at 1304–06; *Smith–Bey v. Hospital Administrator,* 841 F.2d 751, 755 (7th Cir. 1988); *Soo Line R.R. v. Escanaba & Lake Superior R.R.,* 840 F.2d 546, 549 (7th Cir. 1988). Further, the granting of the motion to amend and the amendment of the November 28 judgment was recorded on the district court's docket sheet on December 7, 1988. Finally, the prevailing party in the district court, Wikoff, has not objected to Vanderveld's taking of this appeal based on the absence of a separate judgment form. On the contrary, Wikoff has consistently maintained that the minute order represents a final, appealable decision of the district court. In light of the above circumstances, which are very similar to those present in *Mallis,* we conclude that the parties have waived the separate judgment requirement of Rule 58. Also, because the district court's minute order amending the judgment from which Vanderveld is appealing was entered on the docket, the minute order—constituting the final decision in this case—has been properly entered in accordance with Rule 79(a).

Accordingly, we hold that jurisdiction is present in this case. Before addressing the merits of Vanderveld's appeal, however, we wish to remind district judges to alert their clerks of court to record minute and judgment entries with greater care. Had the amendment of the original judgment been properly set forth on a separate judgment form, as required under Rule 58, the expenditure of scarce judicial resources, both in this court and the district court, on the preceding jurisdictional question would have been unnecessary.

to the district court's entry of judgment *nunc pro tunc* on February 23, 1989. In light of our holding, *infra,* that Vanderveld's December 28 notice of appeal conferred jurisdiction on this

court, it is unnecessary to address whether we have jurisdiction over this case pursuant to Vanderveld's second notice of appeal.

### III.

■ Vanderveld initially contends that the district court erred in construing Wikoff's warranties concerning the accuracy and completeness of MSCI's financial statements as covering only the deliberate concealment of MSCI's liabilities. The warranty at issue provides in pertinent part:

"3.00 *Corporation Matters and Financial Condition.* Seller represents and warrants to the Buyer that:

\*   \*   \*   \*   \*   \*

3.05 *Financial Statements.* ... the Year End Certified Financial Statements have been prepared in accordance with generally accepted accounting principles for the periods therein indicated, and fairly present the financial position of the Corporation....

3.06 *Financial Condition Since Fiscal Year End.* Since September 30, 1984, there has not been any:

\*   \*   \*   \*   \*   \*

(j) material adverse changes in the conditions, liabilities or assets of the Corporation other than as reflected in the Interim Financial Statements.

\*   \*   \*   \*   \*   \*

3.07 *Corporate Liabilities.* The Corporation has no material debt, liability or obligation of any nature ... that is not reflected or reserved against in Corporation's Year End Certified Financial Statements or the Interim Financial Statements...."

According to Vanderveld, these provisions are unconditional and unequivocal warranties from Wikoff that MSCI's financial statements accurately and completely represent the liabilities of the company, including the expiration of the operating permit for the production plant in Union City, California, and the cost of obtaining a new permit, i.e., implementing an approved HMMP.

---

**6.** The parties are in agreement that their contract is governed by Illinois law. Thus, we apply Illinois principles of contract construction in interpreting the provisions of the stock purchase agreement. *LaSalle Nat'l Bank v. Service Merchandise Co.,* 827 F.2d 74, 78 (7th Cir.1987).

■ Under Illinois law,[6] the primary object in contract construction is to give effect to the intent of the parties, which is determined by viewing the language of the contract as a whole. *Braeside Realty Trust Co. v. Cimino,* 133 Ill.App.3d 1009, 89 Ill.Dec. 25, 27, 479 N.E.2d 1031, 1033 (1985). If the language of the contract unambiguously provides an answer to the question of intent, then the inquiry is over. *Airline Stewards & Stewardesses Assn., Local 550 v. American Airlines, Inc.,* 763 F.2d 875, 878 (7th Cir.1985), *cert. denied,* 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986). However, if the trial court determines that the language of the contract is ambiguous, the court may then consider (or admit into evidence for the jury's consideration if a jury is the trier of fact) extrinsic or parol evidence, in addition to the contractual language, to ascertain the intent of the parties.[7] In *LaSalle Nat'l Bank v. Service Merchandise Co.,* 827 F.2d 74 (7th Cir.1987), this court summarized the standards for reviewing a trial court's construction of a contract under Illinois law:

"The question of whether a contract is ambiguous is a conclusion of law and may be reviewed *de novo* by the court on appeal.... If the trial court determines that the contract is unambiguous, it must then go on to declare its meaning. Such a declaration is also a conclusion of law and may be reviewed *de novo....* On the other hand, if the court holds that the contract is ambiguous, its meaning becomes a question of fact and must be submitted to the trier of fact.... [The trier of fact's] determination is a finding of fact and this court must review that finding of fact under the clearly erroneous standard."

*Id.* at 78 (citations omitted).

As noted above, the district court found that Wikoff's warranties concerning the ac-

---

**7.** Indeed, "recent Illinois decisional law clearly provides that when interpreting a contract, the parol and extrinsic evidence is only admissible at trial, for consideration by the trier of fact, if the trial court determines, as a matter of law, that the contract is ambiguous." *Sunstream Jet Express, Inc. v. International Air Service Co.,* 734 F.2d 1258, 1268 (7th Cir.1984) (collecting cases).

curacy of the financial statements were, "if anything, under the circumstances of this case intended as a protection against deliberate concealment of liabilities." In reaching this conclusion the court failed to state explicitly whether it found the language of the contract ambiguous.[8] Nonetheless, we think it is clear from the wording of the court's finding, i.e., "under the circumstances of this case," that the district court found the contractual language ambiguous because had the court determined that the contract was unambiguous, consideration of evidence other than the contract itself would obviously have been improper.[9] Moreover, it is unlikely the court found that the warranty language in the stock purchase agreement unambiguously provided for only deliberate concealment of MSCI liabilities because nowhere in the warranty provisions referenced above are terms such as "deliberate concealment" or "to the best of seller's knowledge" used. Thus, the initial inquiry in this case is whether the trial court erred in determining that the stock purchase agreement is ambiguous.

Wikoff contends that the district court properly determined that the stock purchase agreement was ambiguous because the agreement contained conflicting provisions as to who would assume the financial risk of undiscovered liabilities within MSCI. Specifically, Wikoff argues that the risk for such liabilities is covered by both her warranties concerning the accuracy of MSCI's financial statements and the condition precedent in paragraph 9.15 of the agreement that VandInc determine to its satisfaction, through its investigation and management of MSCI prior to closing, "that all of the liabilities of [MSCI] are as they have been represented in the [financial statements], and that there are no undisclosed or contingent liabilities not previously disclosed to [VandInc]." According to Wikoff, VandInc, on its own initiative, requested the opportunity to investigate MSCI and, thus, obligated itself to determine whether there existed liabilities not disclosed in the financial statements, thus conflicting with her warranty that no undisclosed liabilities existed.[10]

Although it is true that under Illinois law the existence of conflicting provisions in a contract supports a finding that the contract contains an ambiguity, *see Harris Trust & Savings Bank v. Hirsch*, 112 Ill. App.3d 895, 68 Ill.Dec. 383, 445 N.E.2d 1236 (1983), we do not agree that Wikoff's warranties and the condition precedent in paragraph 9.15 are conflicting. The condition precedent that VandInc satisfy itself that all of the company's liabilities were reflected in the financial statements made VandInc's contractual duty to purchase Wikoff's shares in MSCI contingent thereon. In other words, VandInc was not obligated to proceed to closing if, after completing its investigation and pre-closing management of MSCI, agents of VandInc discovered liabilities not disclosed in MSCI's financial documents. However, after the closing, VandInc purchased Wikoff's shares, thus rendering the condition ineffective as a protection against undisclosed liabilities thereafter. It is at this point that the warranty

---

**8.** At oral argument, counsel for Wikoff stated that the trial court made a finding that the contract was ambiguous. However, our review of the court's Findings of Fact and Conclusions of Law reveals no explicit finding concerning the ambiguity of the stock purchase agreement.

**9.** *See, supra,* note 7.

**10.** Paragraph 9.15 goes on to define liabilities to include:

"All long-term and contingent liabilities, current, direct, indirect and other liabilities including, but without limitation, employment, contracts and commitments, sale and material or lenders' agreements, liability claims, material compliance with all state, federal and local regulatory agencies and regulations re-

lating to the products manufactured by the Corporation and the Corporation's activities." Wikoff also contends that because this provision specifically addresses compliance with local regulatory agencies, e.g., the Union City Fire Department, whereas the warranty provisions refer to the liabilities of MSCI in general terms, the more specific provision, i.e., paragraph 9.15, is controlling. However, in light of our determination, *infra*, that the language in the stock purchase agreement is not ambiguous, we need not resort to this rule of construction to determine the intent of the parties. *See Puckett v. Oelze*, 134 Ill.App.3d 1020, 90 Ill.Dec. 67, 71, 481 N.E.2d 867, 871 (1985).

provisions become important. Paragraph 11.11 of the stock purchase agreement explicitly provides that "[a]ll ... warranties ... contained in this Agreement ... shall survive the Closing...." Thus, unlike the condition precedent, the warranties protected VandInc against undisclosed liabilities even after the closing took place. Although the provisions addressed the same problem—the discovery of liabilities not disclosed in the financial statements—each became significant at a different stage of the development of the parties' contractual relationship. We find nothing contradictory in VandInc's protecting itself from such liabilities through both an investigation prior to closing and Wikoff's warranties. Thus, we hold that the trial court erred as a matter of law in finding an ambiguity in the stock purchase agreement concerning Wikoff's warranties. In our opinion, the agreement unambiguously reflects an intent for Wikoff to warrant the accuracy and completeness of MSCI's financial statements, thus assuming the risk for any liabilities not disclosed therein. Because the provisions of the agreement are clear, the district court improperly considered Wikoff's lack of knowledge regarding MSCI's operations and we reject its conclusion that this fact, coupled with the provisions requiring VandInc's investigation of the company, caused the warranties to protect against only the deliberate concealment of liabilities.

■ We also reject the district court's conclusion that Wikoff's warranties never became effective because VandInc did not rely upon them. As noted above, the district court found that the primary safeguards against undisclosed liabilities in MSCI's financial statements were the periods of investigation and joint management prior to closing and that the reason for these safeguards was Wikoff's lack of familiarity with the business affairs of MSCI. Based on these findings the court concluded that VandInc had not relied upon Wikoff's warranties "since [it] chose instead to rely upon an inspection of the business

purchased...." Because, in its opinion, VandInc had not relied upon the warranties, the trial court determined that the warranties never took effect, citing *Stamm v. Wilder Travel Trailers,* 44 Ill.App.3d 530, 3 Ill.Dec. 215, 358 N.E.2d 382 (1976), and *Alan Wood Steel Co. v. Capital Equipment Enterprises, Inc.,* 39 Ill.App.3d 48, 349 N.E.2d 627 (1976).

As an initial matter, we disagree with the district court's finding that because VandInc had relied on its investigation and joint management of MSCI to protect itself against undisclosed liabilities, it could not have relied on Wikoff's warranties. Although it is no doubt true that VandInc relied primarily on its investigation of MSCI to ascertain the financial situation of the company, this fact does not preclude VandInc's reliance on the warranties as well. *See Capital Equipment Enterprises, Inc. v. North Pier Terminal Co.,* 117 Ill.App.2d 264, 254 N.E.2d 542 (1969). As noted above, VandInc's investigation occurred prior to closing, and Wikoff's warranties survived the closing, thus obtaining significance as protection for VandInc's investment at a different stage in the development of the parties' contractual relationship. It is clear from the prefacing statement of the stock purchase agreement that VandInc intended to rely on the warranty provisions in purchasing Wikoff's stock in MSCI.

Moreover, *Stamm* and *Alan Wood Steel,* the cases the district court cited for the proposition that VandInc's purported lack of reliance on the warranties rendered them ineffective, are inapposite to the facts of this case. Both of these cases involve the Uniform Commercial Code's "basis of the bargain" rule, *see* Ill.Rev.Stat., ch. 26, § 2–313, which provides that certain affirmations of fact and descriptions of goods made by a seller rise to the level of express warranties if the buyer relies upon the seller's representations in purchasing the goods.[11] As we noted in *Continental Sand & Gravel, Inc. v. K & K Sand &*

---

11. Because of our determination that *Stamm* and *Alan Wood Steel* are factually inapposite to this case, we need not address Vanderveld's

contention that the cases are inapplicable because no sale of "goods" under the Uniform Commercial Code took place.

*Gravel, Inc.*, 755 F.2d 87, 90 n. 2 (7th Cir.1985), this line of cases is relevant to the question of whether an express warranty has been *created.* The "basis of the bargain" rule is not applicable to situations where the warranties are clear and express. *Id.* In the present case, Wikoff stipulated to the fact that the provisions concerning the financial statements were warranties. Thus, there is no question that a warranty was, in fact, created. Rather, the focus is on the construction of Wikoff's warranties, which we have previously addressed, and whether they were breached. The district court expressly reserved judgment on the question of breach because of its determination that the warranties never became effective. Thus, a remand is necessary in order for the district court to determine, in light of our construction of the contract and determination that VandInc was entitled to rely on Wikoff's warranties, whether a breach of warranty occurred and whether the breach, if any, was so material that MSCI's failure to make its final interest and principal payments under the note was justified. *See Circle Security Agency, Inc. v. Ross*, 107 Ill.App.3d 195, 63 Ill.Dec. 18, 23, 437 N.E.2d 667, 672 (1982).

█ The final issue presented for our review is whether the district court erred in determining that any breach of warranty defense available to Vanderveld had been waived due to MSCI's "failure to bring [the breach] to the attention of the plaintiff and cease performance of the contract.... The waiver [allegedly] occurred by virtue of [MSCI's] acts of continued payment of interest on the note guarantied here through June 1986, several months after the buyer became aware of the absence of the [HMMP]." In support of this conclusion the court found that the failure to raise the breach was contrary to the parties' course of dealings, as well as their intent that problems in the transaction be promptly raised in order that agreements modifying their obligations could be reached.

█ In Illinois, a party to a contract waives his right to relief from the breach

thereof only where the facts and circumstances establish an "intentional relinquishment of a known right ... aris[ing] either expressly or by conduct inconsistent with an intent to enforce the right." *Wald v. Chicago Shippers Assn.*, 175 Ill.App.3d 607, 125 Ill.Dec. 62, 71, 529 N.E.2d 1138, 1147 (1988). Analysis of whether a waiver of a contractual provision has, in fact, occurred focuses on the intent of the non-breaching party. *Id.* "The determination as to what facts are sufficient to constitute waiver is a question of law." *Whalen v. K–Mart Corp.*, 166 Ill.App.3d 339, 116 Ill. Dec. 776, 779, 519 N.E.2d 991, 994 (1988). Thus, our review is *de novo.*

Vanderveld argues that Wikoff failed to establish an "intentional relinquishment of a known right" because there was no evidence demonstrating either that the parties had established a course of dealing for raising breach of warranty claims or that MSCI knew of the economic consequences —namely, the cost of creating and implementing a HMMP—of renewing the Union City plant's expired operating permit prior to June 1986, when it ceased making payments on the note. Wikoff contends that VandInc learned from its investigation of MSCI that the plant's operating permit had lapsed and that VandInc failed to notify her of the purported breach until she filed this lawsuit, despite its opportunity to do so during the two renegotiations of the stock purchase price prior to closing, thus evincing an intent to waive the warranty concerning the financial statements.

Upon review, we are of the opinion that the trial court's findings of fact are insufficient for us to resolve this dispute on appeal. The parties did in fact negotiate reductions in the purchase price of Wikoff's MSCI shares on two separate occasions between the execution of the stock purchase agreement on March 29, 1985, and the closing of the sale on July 29, 1985. However, neither of these renegotiations occurred because Wikoff's performance under the stock purchase agreement was somehow defective.[12] Moreover, there is

---

12. The purchase price was initially reduced   from $750,000 to $690,000 on May 13, 1985,

no finding that VandInc knew or should have known [13] of the lapse of the operating permit at the time of these negotiations, much less a finding that VandInc was aware of the costs associated with renewing the permit at that time. The court did make findings of fact reciting that in October 1985, John Wright, the Union City plant manager, submitted a proposed HMMP which was ultimately rejected, and that in March 1986, MSCI retained Bechtel National to create a HMMP for the Union City plant, the cost of which was over $20,000. However, there is no finding stating at what point MSCI should have been able to determine, with reasonable certainty, the costs of renewing the permit.[14] Because under Illinois law a party's remedy for breach of contract, as well as his right to cease performance on the contract, depends on whether the breach is material or minor, *see Circle Security Agency, Inc., supra,* 63 Ill.Dec. at 23, 437 N.E.2d at 672, such a finding, in our opinion, is of utmost importance in determining whether an "intentional relinquishment of a known right" occurred in this case. *See Harrington v. Kay,* 136 Ill.App.3d 561, 91 Ill.Dec. 214, 218, 483 N.E.2d 560, 564 (1985). On remand, the district court should determine when, if at all, MSCI learned of the economic consequences of the lapse of the Union City plant's operating permit and whether its delay, if any, in ceasing to make payments on the note after acquiring such knowledge evidenced "conduct inconsistent with an intent to enforce the [warranty]." *Wald, supra,* 125 Ill.Dec. at 71, 529 N.E.2d at 1147.

## IV.

For the reasons stated, we reverse the district court's construction of the warranties given by Wikoff in the stock purchase agreement as covering only the deliberate concealment of liabilities from MSCI's financial statements, as well as its finding that the warranties never took effect because VandInc relied only on its investigation and management of the company prior to closing. We hold that the warranties were intended to protect VandInc against all undiscovered liabilities not disclosed in MSCI's financial statements and were not rendered ineffective because of VandInc's investigation. Because the court did not reach the question of whether the warranties were breached, we remand for such a determination in light of the above holding. Additionally, on the question of waiver, we remand for specific findings of fact regarding when VandInc and/or MSCI knew or should have known of the financial ramifications of Wikoff's breach of warranty, if any. We shall leave for the district court's determination whether such findings require the presentation of additional evidence or argument. Circuit Rule 36 shall not apply.

REVERSED AND REMANDED.

---

because of expenses VandInc incurred in removing hazardous wastes from MSCI's plants in Illinois and California. Paragraph 7.11 of the stock purchase agreement explicitly provides for a reduction in the original purchase price based on waste removal performed by VandInc. The second reduction in price ($690,000 to $500,000) occurred pursuant to the modification agreement executed on July 29, 1985. The district court found that the basis for this reduction was "concern by MSCI's lender about [Wikoff] receiving the full price from the sale of MSCI in cash."

13. In *Whalen, supra,* the Appellate Court of Illinois held that a plaintiff claiming breach of contract based on the defendants' failure to obtain insurance before commencing work under the contract had waived the breach, despite the fact that the plaintiff was unaware of the defendants' lack of insurance at the time they began work on the contract. The court stated that the plaintiff "is presumed to know those things which reasonable diligence on their part would bring to their attention." 116 Ill.Dec. at 779, 519 N.E.2d at 994.

14. In light of the fact that a HMMP has never been approved for the Union City plant, it is at least arguable that MSCI is not yet able to determine the costs associated with renewing the plant's operating permit.