HOWARD JOHNSON AND COMPANY, Plaintiff-Appellee, v. DAVID C. FEINSTEIN *et al.*, Defendants-Appellants.

First District (4th Division)   No. 1—92—3172

Opinion filed January 29, 1993.

830

Thomas D. Rosenwein and Kathryn E. Garipay, both of Schaefer, Rosenwein & Fleming, of Chicago, for appellants.

Paul K. Vickrey and Adam M. Kingsley, both of Hopkins & Sutter, of Chicago, for appellee.

PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

A preliminary injunction was entered against the defendants David C. Feinstein and Ted Windsor to enforce certain noncompetition agreements. The injunction prohibited them from soliciting or accepting business from former clients and prospects of the plaintiff, Howard Johnson & Company (Howard Johnson). In this interlocutory appeal, the defendants contend that the noncompetition agreements were replaced and superseded by the terms of a merger agreement executed by the parties, that the noncompetition agreements were unreasonably broad and that the order granting injunctive relief is void for lack of specificity.

The defendants are professional actuaries who, in the late 1980s, joined the Illinois actuarial firm of Skalinder, Wilkinson & Associates (SWA). In 1990, Feinstein owned 8% of the shares of SWA; Windsor owned 2%. Howard Johnson is an actuarial company headquartered in Seattle, Washington, with several subsidiary offices throughout the nation. Seeking to expand into the Chicago market, Howard Johnson contacted SWA to negotiate a merger. As a result of these negotiations, Howard Johnson agreed to employ the defendants, issue them stock in Howard Johnson and pay them cash for their shares in SWA. The named partners in SWA, Greg Skalinder and Joe Wilkinson, entered into similar agreements and were also made directors of Howard Johnson.

Of the documents effectuating the merger between Howard Johnson and SWA, three have particular significance to this appeal. The first is the "Agreement to Preserve Client and Customer Knowledge, Corporate Goodwill, and Non-Competition" (noncompetition agreement). Feinstein and Windsor each signed a noncompetition agreement on April 9, 1990. The noncompetition agreements provided that as an inducement for Howard Johnson to employ the defendants and to purchase their shares in SWA, the defendants for a period of three years would not:

"Solicit or accept business of the kind engaged in by [Howard Johnson] or assist others directly or indirectly, to solicit or perform such business from or on behalf of any such client or former client *** or from any person or entity who was being actively solicited as a potential client during the one year per-

iod immediately prior to Shareholder-Staff Member's termination of employment with [Howard Johnson]."

The agreements stated that the prohibitions did not apply to services not previously provided by Howard Johnson. The noncompetition agreements further stated the remedies available to Howard Johnson in the event of a breach. These remedies are as follows:

"A. [L]iquidated damages equal to three years gross billings paid by any person or entity who was a [Howard Johnson] client [to the shareholder].

B. [E]ntry of a restraining order with a maximum bond of $100 enjoining the Shareholder *** from further soliciting or accepting business from any persons or entities who are or were clients of [Howard Johnson].

C. [A]n award of reasonable attorney's fees *** for enforcing the provisions of this agreement regardless of whether suit is instituted."

The agreements provided that if the restriction on soliciting or accepting clients was violated, the prohibitions would automatically extend for an additional three years from the date of the violation and the liquidated damages penalty would extend for another four years from the date of the violation.

The second document significant to this appeal is the merger agreement, signed two days after the noncompetition agreements, which comprehensively set forth the terms of the merger. Section 13.8 of the merger agreement states that "[t]his Agreement (including all exhibits attached hereto and all documents delivered as provided for herein) replaces and supersedes all prior or contemporaneous agreements, written or oral, as to the subject matter hereof."

Attached to the merger agreement is the third document of concern to this appeal, the shareholder's agreement. The shareholder's agreement, like the merger agreement, is dated April 11, 1990. Section 8, entitled "Price of Shares," states the computations to be made in determining the price at which shares may be purchased and sold. Section 8.5(a) states that the purchase price of shares sold to Howard Johnson by withdrawing shareholders shall be reduced by the amount of any indebtedness that the shareholder owes to Howard Johnson. Section 8.5(b) then provides as follows:

"The price to the Selling or Withdrawing Shareholder shall be further reduced by an amount equal to the annual revenues paid by clients to the Company retaining the services of the Selling or Withdrawing Shareholder after the Shareholder has left the Company, where such Shareholder is providing services

to such clients which are competitive with the services of [Howard Johnson] *** ."

Two years after the merger, on June 14, 1992, the defendants notified Howard Johnson that they would be terminating their employment in order to start their own benefits consulting practice. On June 23, 1992, Howard Johnson sent a letter to the defendants reminding them of their obligations under the noncompetition agreements. After receiving information that the defendants were accepting business from Howard Johnson clients, Howard Johnson initiated the instant litigation seeking injunctive relief.

An evidentiary hearing was held at which testimony was presented by the defendants, Howard Johnson (the plaintiff's president), Greg Skalinder, and Donald McDonald, one of the Howard Johnson clients from whom the defendants accepted business. Howard Johnson's president testified that the company was seeking to merge with a local firm in order to expand into the Chicago market. He testified that there were 10 or 12 significant firms and many smaller firms which performed the same services as Howard Johnson. SWA was chosen for the merger because of its excellent reputation. Johnson testified that it takes approximately one year to develop a client and that steps were taken to protect the SWA client base. One of the steps was to require the defendants to sign noncompetition agreements. Following the hearing, the trial court determined that the noncompetition agreements were not superseded by the merger agreement and that the noncompetition agreements were ancillary to the sale of a business and reasonable in their terms. The court then entered the following order:

"This matter coming on to be heard on Plaintiff's Motion for Preliminary Injunction to enforce certain noncompetition agreements dated April 9, 1990, the Court having considered the evidence and the briefs and arguments, it is hereby ordered that

(1) Plaintiff's motion is granted for the reasons stated in open court, and

(2) Plaintiff is required to post a bond of $100,000."

The defendants first contend that the trial court erred as a matter of law in determining that the noncompetition agreements were not replaced and superseded by the terms of the merger agreement. As stated earlier, the merger agreement provided that it "replaces and supersedes all prior or contemporaneous agreements *** as to the subject matter." According to the defendants, both the noncompetition agreements and the shareholder's agreements concern the same subject matter, i.e., what happens when a departing shareholder com-

petes by accepting work from a former client of Howard Johnson. The noncompetition agreements were signed two days before the merger agreement and were not mentioned in the merger agreement. The merger agreement did specifically refer to the shareholder's agreements. Therefore, the defendants argue that the merger agreement served to extinguish the noncompetition agreements. Howard Johnson responds that the shareholder's agreements and the noncompetition agreements serve different purposes and did not address the same subject matter. Howard Johnson asserts that the defendants' interpretation would lead to the absurd result of nullifying documents signed just two days before the merger agreement.

■ A contract should be construed as a whole to give effect to the intention of the parties, and great weight should be given to the principal, apparent purpose and intention of the parties at the time they entered into the contract. (*De Witt County Public Building Comm'n v. County of De Witt* (1984), 128 Ill. App. 3d 11, 18, 469 N.E.2d 689.) Contractual terms should be construed to avoid the conclusion that other terms are meaningless. *De Witt*, 128 Ill. App. 3d 11, 469 N.E.2d 689.

■ The determinative factor in resolving this issue is whether the noncompetition agreements and shareholder's agreements concern the same subject matter. Only those prior or contemporaneous agreements which concern the same subject matter as the merger agreement are replaced and superseded by the merger agreement. Our review of these two documents leads us to conclude that they do not concern the same subject matter. It is true, as the defendants assert, that both the noncompetition agreements and the shareholder's agreements affect departing shareholders who later compete with Howard Johnson. However, a reading of the documents establishes that they were designed to serve completely different purposes. The section of the shareholder's agreement pertinent to this appeal provides for a loss of shares in relation to the amount of work performed by departing shareholders who compete with Howard Johnson. As such, it addresses the concern resulting from having individuals whose interests are adverse to Howard Johnson holding Howard Johnson stock. The noncompetition agreements, on the other hand, serve to protect the company's client base and include remedies sufficient to afford that protection, such as injunctive relief and liquidated damages. Furthermore, the noncompetition agreements spell out with specificity the type of conduct which is prohibited. We accordingly do not accept the defendants' contention that the noncompetition agreements were replaced and superseded by the terms of the merger agreement.

The defendants next contend that the trial court erred in granting injunctive relief based on the noncompetition agreements because the agreements were unreasonably broad. The defendants argue that the agreements were unreasonable in terms of the type of activity prohibited because they barred not only solicitation but also the mere acceptance of former Howard Johnson clients as well as prospects solicited by Howard Johnson. The defendants further assert as unreasonable the provisions which extend the prohibitions for an additional three years, and in some respects four years, in the event a former Howard Johnson client or prospect is accepted.

■ The noncompetition agreements in the case at bar were ancillary to the sale of a business. Illinois courts have distinguished between restrictive covenants based on an employment relationship and restrictive covenants which are ancillary to the sale of a business. (*Dryvit System, Inc. v. Rushing* (1985), 132 Ill. App. 3d 9, 13, 477 N.E.2d 35.) In *Dryvit*, this court noted that the interest to be protected in the sale of a business is the good will purchased by the buyer. "A transfer of good will cannot be effectively accomplished without an enforceable agreement by the transferor not to act so as unreasonably to diminish the value of that which he is selling." (Blake, *Employee Agreements Not To Compete*, 73 Harv. L. Rev. 625, 646 (1960).) Also, the bargaining power attendant to the sale of a business is not as uneven as it generally is in an employer/employee relationship. For these reasons, the courts are less likely to declare invalid a restrictive covenant ancillary to the sale of a business than they would be to invalidate a restraint based on an employer/employee relationship. *Dryvit*, 132 Ill. App. 3d 9, 477 N.E.2d 35; *Hamer Holding Group, Inc. v. Elmore* (1990), 202 Ill. App. 3d 994, 1008, 560 N.E.2d 907.

■ The defendants argue that we cannot conclude that the noncompetition agreements were ancillary to the sale of a business because the merger agreement does not list the execution of the noncompetition agreements as conditions precedent to the sale. In our view, the facts and circumstances surrounding the merger and the testimony elicited at the hearing support a finding that the noncompetition agreements were ancillary to the sale of a business. The record shows that Howard Johnson negotiated the merger with SWA as a means of entering the Chicago market. Howard Johnson's president testified that SWA's clientele was its main asset. The defendants were paid cash for their shares in SWA, received stock in Howard Johnson and signed the noncompetition agreements two days before the merger agreement was signed. In determining whether a restrictive cove-

nant is ancillary to the sale of a business, a court will consider the facts bearing on the parties' intent to protect the integrity of a sale. (*Hamer Holding Group, Inc. v. Elmore* (1990), 202 Ill. App. 3d 994, 1008, 560 N.E.2d 907.) We believe that the facts before us show that the noncompetition agreements were entered into to protect against the threat of the defendants walking away with SWA's client base, which was the main asset of the sale.

■■ The question then becomes whether the restrictions in the noncompetition agreements were reasonable. The validity of a restrictive covenant is determined by its reasonableness in terms of the effect on the parties and the public. (*Dryvit System, Inc. v. Rushing* (1985), 132 Ill. App. 3d 9, 12, 477 N.E.2d 35.) It must be reasonable as to time, geographical scope and activity. (*Dryvit*, 132 Ill. App. 3d 9, 477 N.E.2d 35.) In the context of the sale of a business, the restriction must not be greater than necessary to protect the buyer, oppressive to the seller or injurious to the general public. *Hamer Holding Group, Inc. v. Elmore* (1990), 202 Ill. App. 3d 994, 1009, 560 N.E.2d 907.

■■ The noncompetition agreements here contain what is generally known as an activity restraint. (See *Dryvit*, 132 Ill. App. 3d at 14, 477 N.E.2d at 38-39; Blake, *Employee Agreements Not To Compete*, 73 Harv. L. Rev. at 675.) Rather than prohibiting all competition within a particular geographical area, the restraint is limited by the type of activity prohibited. (Restatement (Second) of Contracts §188, Comment *d*, at 43 (1981).) Activity restraints are subject to a less stringent test of reasonableness than that which is applied to restrictions with a geographical limitation. *Dryvit*, 132 Ill. App. 3d at 14, 477 N.E.2d at 39.

The noncompetition agreements signed by the defendants prohibit them for a period of three years from soliciting or accepting business of the kind engaged in by Howard Johnson from former Howard Johnson clients or from any person who is being actively solicited as a potential client during the one year preceding the defendants' termination of employment. The plaintiff's president testified that it took approximately 12 months to develop a client. The agreements do not prohibit the defendants from competing with Howard Johnson or from accepting work from Howard Johnson clients provided the work was not of the type engaged in by Howard Johnson. We believe that the activity restraint in the instant cause was carefully tailored and narrowly drawn to meet the interests of both Howard Johnson and the defendants. See *A.B. Dick Co. v. American Pro-Tech* (1987), 159

Ill. App. 3d 786, 795-96, 514 N.E.2d 45 (Jiganti, J., specially concurring).

The defendants nevertheless argue that the scope of the agreements is unreasonably broad because they prohibit not only solicitation, but also the mere acceptance of business from former Howard Johnson clients. We disagree. Restrictive covenants prohibiting the acceptance of business or the furnishing of services have been upheld even where they were ancillary to an employment relationship. (*McRand, Inc. v. van Beelen* (1985), 138 Ill. App. 3d 1045, 1055, 486 N.E.2d 1306.) The rationale for upholding a restriction on the acceptance of business from former clients is even greater where it is ancillary to the sale of a business. Without the protection of such a restriction, the buyer would face the possibility of losing to the seller the main asset of the sale, *i.e.*, the seller's client base. We are satisfied that the noncompetition agreements are reasonable in the scope of business activity prohibited.

The defendants also maintain that the noncompetition agreements were unreasonable in duration. They specifically challenge the provision that extends the prohibitions in the event the agreement is violated. In support of this argument, the defendants cite *Jefco Laboratories, Inc. v. Carroo* (1985), 136 Ill. App. 3d 793, 483 N.E.2d 999, in which a restrictive covenant was found unreasonable in part because of a provision which extended the restrictions in the event of a violation. *Jefco*, however, involved a covenant ancillary to an employment contract. In invalidating the covenant, the court relied significantly upon the employee's lack of bargaining power, noting that the employee "must either sign the contract or be discharged." (*Jefco*, 136 Ill. App. 3d at 800, 483 N.E.2d at 1003.) Here, the record shows that the defendants, who are professional actuaries, engaged in negotiations involving the sale of a business. As we stated in *Dryvit*, the bargaining power attendant to the sale of a business is not as uneven in the employer/employee relationship and the courts are accordingly less likely to invalidate covenants ancillary to the sale of a business. The defendants agreed to the terms regarding duration and have not persuaded us that reasons exist for releasing them from the consequences of their bargain.

The defendants next contend that the noncompetition agreements were injurious to the public because they had the effect of unreasonably narrowing the market and limiting the public's right to choose a professional actuary. However, at the hearing, Howard Johnson presented testimony that there were 10 or 12 significant firms and several smaller firms in the Chicago area which performed the type of work done by Howard Johnson. In our view, the record does not support the

defendants' contention that the noncompetition agreements were unreasonable because of their effect on the general public.

Finally, the defendants maintain that the order entered by the trial court was defective because it was not sufficiently specific to comply with the requirements of section 11—101 of the Code of Civil Procedure, which provides as follows:

> "Every order granting an injunction and every restraining order shall set forth the reasons for its entry; shall be specific in terms; [and] shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained ***." Ill. Rev. Stat. 1989, ch. 110, par. 11—101.

The order in the instant cause, quoted earlier, merely states that Howard Johnson's motion to enforce the noncompetition agreements is granted. As such, it does not specifically describe the acts to be enjoined, but rather refers to the noncompetition agreements. In arguing that the order should be considered void for lack of specificity, the defendants cite *Streif v. Bovinette* (1980), 88 Ill. App. 3d 1079, 411 N.E.2d 341, and *Carriage Way Apartments v. Pojman* (1988), 172 Ill. App. 3d 827, 527 N.E.2d 89. In *Streif*, the court's order was deemed too imprecise to enforce because it failed to define the terms "annoying" and "harassing." (*Streif*, 88 Ill. App. 3d at 1085, 411 N.E.2d at 346.) In *Carriage Way*, the order was fatally defective because it failed to specify which parties were to contribute what amounts into an escrow fund. (*Carriage Way*, 172 Ill. App. 3d at 840, 527 N.E.2d at 97.) Unlike the situations in *Streif* and *Carriage Way*, we do not believe that the parties in the case at bar were unclear as to the meaning of the trial court's order. Nevertheless, the order does violate the requirements of section 11—101 of the Code of Civil Procedure by referring to another document instead of specifying in express terms what actions are to be enjoined. We believe that the proper remedy is to remand the order to the trial court with instructions to modify the order in compliance with the statutory requirements.

For the foregoing reasons, the judgment of the trial court is affirmed, and the order is remanded to the trial court to be modified in accordance with the instructions stated in this opinion.

Affirmed; order remanded.

JOHNSON and CAHILL, JJ., concur.