**WCC FUNDING LIMITED, Plaintiff,**

v.

**GAN INTERNATIONAL, Defendant/Third–Party Plaintiff,**

v.

**Darrell BLAESS and Richard Fanslow, Third–Party Defendants.**

**Darrell BLAESS, Third–Party Counterclaimant,**

v.

**GAN INTERNATIONAL, Defendant to Third–Party Counterclaim.**

**No. 93 C 969.**

United States District Court, N.D. Illinois, Eastern Division.

Dec. 19, 1994.

---

Richard Cartier Godfrey and Lee Radford, Kirkland & Ellis, Chicago, IL, for WCC Funding Ltd., plaintiff.

Bruce R. Alper, Randall Marc Lending, Edward C. Jepson, Jr., and Carlys Elizabeth Belmont, Vedder, Price, Kaufman & Kammholz, Chicago, IL, for GAN Intern., defendant.

## OPINION AND ORDER

NORGLE, District Judge:

Before the court are the cross motions of defendant GAN International ("GAN") and of plaintiff WCC Funding Limited ("WCC") for summary judgment on counts I and II of the complaint. For the following reasons, GAN's motion is granted and WCC's motion is denied.

### FACTS [1]

WCC is an Illinois corporation, with its principal place of business in Chicago, Illi-

---

1. The following facts are drawn from various statements the parties submitted in compliance with Rules 12(M) and 12(N) of the Rules of the United States District Court for the Northern District of Illinois ("Local Rules"). Local Rules 12(m) and 12(n) govern the motion submitted by Gan because its motion was filed prior to the effective date of the amendment, April 4, 1994, to the Local Rules. Local Rules 12(M) and 12(N), however, govern WCC's cross motion for partial summary judgment because it filed the motion on April 29, 1994. The court will accept those factual statements that are both well pled and in compliance with the requirements of Local Rules 12(m) or 12(M)(3), 12(n) or 12(N)(3)(a) and 12(N)(3)(b). Further, any facts asserted by the movants in the 12(m), 12(M)(3), and 12(N)(3)(b) statements are deemed admitted unless the responding party contradicts them in the manner specified under Local Rules 12(n) or 12(M) and

nois, formed specifically to acquire the outstanding capital stock of Hawkeye National Life Insurance Company ("HNL"). HNL is an Iowa corporation with its principal place of business in Des Moine, Iowa. Third-party defendant Darrell Blaess ("Blaess") was the president and director of HNL during the relevant period. GAN is a French international holding corporation with its principal place of business in France which owns all of the outstanding capital stock of HNL.

On April 15, 1992, WCC and GAN entered into a fully integrated written Stock Purchase Agreement ("Agreement").[2] WCC, as the prospective buyer, and GAN, as the prospective seller, entered into the Agreement for the purpose of buying and selling all of the outstanding HNL capital stock. On April 23, 1992, eight days after the execution of the Agreement, WCC paid $50,000 for the right to conduct the due diligence investigation for a period of thirty days until May 15, 1992. On May 15, 1992, WCC sent a letter identified in WCC's motion as a "notice of breach" which stated that[3]:

> As you may be aware, after our discussion yesterday I sent you a letter agreement for purposes of extending the date by which action would have been required to be taken by WCC Funding Limited under Section 2.03 of the Stock Purchase Agreement between WCC Funding Limited and GAN International relating to the sale and purchase of the stock of [HNL]. When I called this morning to find out the status of the letter agreement, I was advised that you are out today, and therefore thought that in light of our discussions, it would be appropriate for me to write to you.
>
> I am sure you can appreciate that because GAN International has still not provided WCC Funding with the terms under which GAN or its affiliates will continue to provide reinsurance to [HNL], an important element of the completion of WCC Funding's due diligence review is missing. As a result, we expect that the extension agreement will be entered into and the missing information promptly provided to assure that WCC Funding can complete its due diligence review with the benefit of all information which your client agreed to provide under the Stock Purchase Agreement before it is required to pay an additional $100,000 to extend the due diligence period
>
> . . . .

(WCC's Ex. 20.) The alleged "notice of breach" only discussed the insufficiency of § 5.04(a) compliance. No other violations were mentioned or referred to in the "notice of breach." After receiving the "notice of breach," GAN allegedly did not cure the § 5.04(a) violation within fourteen days. Therefore, according to WCC, the Agreement terminated on May 30, 1992, pursuant to the operation of § 8.01(3). Despite WCC's position that the Agreement terminated on May 30, 1992, WCC paid $100,000 on May 15, 1992, to extend the thirty-day period to perform due diligence investigation for an additional thirty days, until June 15, 1992.

On June 11, 1992, in a telephone conversation, WCC and GAN agreed to extend the due diligence period from June 15, 1992, to June 26, 1992. Following the conference, WCC sent a letter to GAN which memorialized the discussion. The letter stated in relevant part that:

> As we attempt to communicate to you in our telephone conversation, we have seri-

---

12(N)(3)(a). *Knox v. McGinnis*, 998 F.2d 1405, 1408 n. 8 (7th Cir.1993); *see also Early v. Bankers Life & Casualty Co.*, 853 F.Supp. 1074, 1079 (N.D.Ill.1994) (holding that failure to comply with Rule 12(n) results in material facts being admitted). A mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material. *Edward E. Gillen Co. v. City of Lake Forest*, 3 F.3d 192, 196 (7th Cir.1993). The Seventh Circuit has repeatedly upheld the district court's strict application of Local Rule 12(N). *Schulz v. Serfilco, Ltd.*, 965 F.2d 516, 519 (7th Cir.1992) (collecting cases).

2. The parties agree that the terms of the Agreement are plain, clear, and unambiguous.

3. Quoting the relevant portions, if not all, of the letters the court discusses in this opinion is appropriate because WCC's summary characterization of this letter and others are inaccurate and misleading. Hence, for purposes of determining the facts of the case, the actual language contained in the relevant letters must be examined.

ous interest in continuing a dialogue regarding Hawkeye National with GAN in hopes that we may ultimately resolve our differences amicably. In order to discuss a resolution of the issues pending between us, we accept the offer you made in our telephone conversation today that this matter will be stayed for two weeks, until June 26, 1992. This standstill arrangement will be without prejudice to any parties' position, rights, or remedies. . . .

(WCC's Ex. 17.) In response to the written communication, GAN replied with its own letter on June 15, 1992, which in relevant portion said the following:

Further, since you indicated your serious interest to continue a dialogue regarding the purchase of Hawkeye, we hereby agree to grant you an extension of time to June 26, 1992 in which to complete your due diligence review pursuant to Section 2.03 of the Stock Purchase Agreement dated April 15, 1992 without additional payment from you with respect to this extension. . . .

(GAN's Ex. R.) In extending the due diligence period from June 15, 1992, to June 26, 1992, WCC did not provide additional monetary consideration to GAN. *See* (Agreement ¶ 8.03.)[4] On June 16, 1992, WCC replied to GAN's June 15, 1992 letter and stated the following:

Thank you for your June 15, 1992 letter. While we are not in accord with all of the statements made, we too look forward to meeting with you on June 18 and June 19 in Chicago.

Pursuant to your request, we will have our consulting actuaries available for the meeting on June 18 with you, Steve Griffith and Darrell Blaess and our counsel will be available for the meeting on June 19 with you, Peter Williams and Paul Meyer. In addition, Richard Fanslow and I believe that a meeting between principals (without counsel) as was planned in Paris for June 12 would help us resolve our differences

and, in combination, allow us to craft a mutually beneficial solution. Please advise me if your schedule would accommodate meeting at your hotel for breakfast on Thursday.

(WCC's Ex. 31.) As scheduled, the parties met, but failed to reach a resolution as to the Agreement. Subsequently, more written communication was exchanged between WCC and GAN.

On June 25, 1992, WCC wrote a letter on the assumption that GAN had granted WCC a second extension of the due diligence period from June 26, 1992, to July 10, 1992:

Thank you for taking the time to speak with me and Mr. Fanslow this morning. As you are aware, we have agreed to a standstill under our agreements relating to WCC Funding Limited's acquisition of Hawkeye National Life Insurance Company from GAN International until June 26, 1992. *As a follow up to our conversation, this letter will confirm our agreement to extend such standstill for an additional ten business days, until July 10, 1992, without prejudice to any parties' position, rights or remedies.*

Since our meeting in Chicago of June 18 and June 19, we have been working diligently to refine our settlement proposal. As we are expecting a summary of covered benefits under Hawkeye National's extended health plan from Paul Meyer at Rogers & Wells yet today, we hope to complete a more definitive proposal for your consideration by Tuesday, June 30 or Wednesday, July 1. If this timetable does not allow you adequate time to both review your options with M. Cato and M. Belinguier and respond to me or Mr. Fanslow by July 10, please contact me at your earliest convenience with a more appropriate arrangement. . . .

(WCC's Ex. 21.) (Emphasis added). In response to this letter, GAN declined to extend

---

4. Section 8.03 provides that:

At any time prior to the consummation of the purchase and sale of the Shares, the parties hereto may (a) amend this Agreement, (b) extend the time for the performance of any of the obligations or other acts of the other parties

hereto. . . . Any such amendment, extensions or waiver shall not be effective unless evidenced by a written instrument signed on behalf of the party to be bound thereby. . . . (Agreement § 8.03.)

the period and informed WCC of the following:

> This letter is written in response to your letter to me dated June 25, 1992 in an effort to avoid any misunderstanding concerning our discussions relating to Hawkeye National Life Insurance Company. As agreed in my letter to you dated June 15, 1992, GAN International granted WCC Funding Limited an extension of time to June 26, 1992 in which to complete its due diligence review pursuant to Section 2[.]03 of the Stock Purchase Agreement. Therefore, the Stock Purchase Agreement remains in effect but, as we discussed in our meeting in Chicago on June 18 and June 19, will terminate and be of no further force and effect unless WCC Funding Limited advises GAN International in writing today that it is accepting the Stock Purchase Agreement....

(GAN's Ex. V.)

On June 26, 1992, WCC did not accept the terms of the Agreement in writing and tender the requisite earnest money into an escrow account. Instead, WCC sent a letter on July 1, 1992, detailing its proposal to liquidate HNL. Subsequently, WCC's counsel sent a letter on July 6, 1992, to GAN's counsel indicating WCC's position for the first time that GAN breached the Agreement. The letter stated the following:

> We understand that WCC Funding Limited and GAN International have been actively discussing the possibility of a reinsurance transaction in the context of the liquidation of Hawkeye National. We know that WCC Funding looks forward to continuing those discussions and receiving a response from GAN regarding the detailed proposal sent to Philippe Cornut last week.
>
> This letter, however, is written in response to Mr. Cornut's letter to Quinn Fanning dated June 26, 1992. Although we are encouraged from the recent meetings and conversations that the parties may be able to reach an agreement which will be bene-

ficial to both sides, we also believe it appropriate that you and your client understand WCC Funding's position with respect to the status of the Stock Purchase Agreement in the context of the standstill arrangement currently in effect. While we understand that you may disagree with our view, we believe that GAN has breached the Agreement, that the Agreement terminated as a result of such breach, and therefore, WCC Funding is entitled to its damages resulting from such breach, including, but not limited to, its expenses incurred in connection with this transaction. During the period of the standstill agreement, it is WCC Funding's intention not to pursue its damage claim in the hopes that the parties will be able to come to an agreement regarding this matter.

(WCC's Ex. 25.) Over the next few months, the parties made an attempt to engage in mutually beneficial business decisions. They were unable to accomplish this end.

As a result, on January 6, 1993, WCC wrote GAN pursuant to § 9.01 of the Agreement and sought indemnification for GAN's breach of the Agreement. On February 3, 1993, GAN responded to WCC's letter and informed WCC that pursuant to § 2.03, that GAN is entitled to keep the $150,000 paid to conduct the due diligence review and that neither party has liability to the other. WCC takes the position that because GAN did not respond to the letter of January 6, 1993, within ten days, GAN waived the right to defend WCC's claims for damages under § 9.02. On February 16, 1993, WCC filed a three-count complaint against GAN.[5]

## DISCUSSION

■ Federal Rule of Civil Procedure 56(c) provides that a summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

---

**5.** The court has jurisdiction over the matter pursuant to 28 U.S.C. § 1332(a)(2) and § 5.10 of the Agreement. The relevant portion of § 5.10 provides that "[s]eller expressly submits and consents to the jurisdiction and venue of any state or federal court located within Cook County, Illinois and any action, suit or proceeding commenced therein in connection with this agreement or any of Seller's obligations thereunder...." (Agreement § 5.10.)

moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Transportation Communications Int'l Union v. CSX Transp., Inc.,* 30 F.3d 903, 904 (7th Cir.1994). Summary judgment is not a discretionary remedy; it must be granted when the movant is entitled to it as a matter of law. *Jones v. Johnson,* 26 F.3d 727, 728 (7th Cir.1994) (per curiam). Even though all reasonable inferences are drawn in favor of the party opposing the motion, *Associated Milk Producers, Inc. v. Meadow Gold Dairies,* 27 F.3d 268, 270 (7th Cir.1994), presenting only a scintilla of evidence will not suffice to oppose a motion for summary judgment. *Walker v. Shansky,* 28 F.3d 666, 671 (7th Cir.1994).

■ Moreover, the disputed facts must be those that might affect the outcome of the suit to properly preclude summary judgment. *Beck Oil Co., Inc. v. Texaco Ref. & Mktg., Inc.,* 25 F.3d 559, 561 (7th Cir.1994). A dispute about a material fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Accordingly, the nonmoving party is required to go beyond the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to designate specific facts showing a genuine issue for trial. *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991).

WCC seeks judgement as a matter of law in its favor on counts I and II of the complaint. In count I, WCC requests the five million dollars or more that WCC *would have* gained by purchasing HNL stock, and the amounts expended in performing the due diligence investigation.[6] In count II, WCC requests the same but under the theory that GAN is contractually obligated to indemnify WCC for those losses.

WCC contends that the Agreement was a bilateral contract and GAN's failure to comply with the terms resulted in a total breach of the contract. WCC takes the position that during the due diligence period the Agreement was a bilateral contract in which WCC agreed to pay GAN ten million dollars in consideration for HNL capital stock. WCC argues that the parties scheduled a closing date[7] for the subject transaction to take place several months after executing the Agreement on April 15, 1992, to allow WCC to conduct a due diligence investigation and GAN to satisfy its duties and obligations under the terms of the Agreement. WCC further takes the position that the Agreement provided WCC with the option to terminate the Agreement by paying the amount it tendered to GAN for due diligence investigation as liquidated damages. Accordingly, WCC claims that until it terminated the Agreement, GAN assumed a continuing obligation to comply with all of the terms of the Agreement.

WCC also claims that during the first due diligence period, it was confronted with significant financial risks because of the delay between the execution of the Agreement on April 15, 1992, and the scheduled date for the closing of the transaction. To insure against this "significant risk," WCC negotiated §§ 8.01(3) and 8.02. The relevant language of § 8.01(3) provides that:

> This Agreement shall terminate ... if there shall have been any material breach of any covenant of Seller hereunder and such breach shall not have been remedied within fourteen (14) days after receipt of by Seller of notice in writing from Buyer

---

6. WCC also seeks prejudgment interest on the amount of the damages, but for purposes of these cross motions for summary judgment, this relief is not relevant to the discussion.

7. Section 1.04 of the Agreement provides that: The sale and delivery of the Shares to [WCC], the payment of the Purchase Price to [GAN] and the consummation of the other transactions contemplated hereby to occur contemporaneously therewith (the "Closing") shall take place at the offices of Rogers and Wells ...

commencing at 10:00 a.m. local time on that date which is the earlier of (a) June 30, 1992 or (b) the business day which is the fifth business day immediately following the date the last regulatory approval or consent required by Section 7.01 hereof is received by [WCC] and [GAN] ... or at such other place, time or date as the parties hereto may hereafter agree to in writing....
(Agreement § 1.04.)

·specifying the nature of the breach and requesting such be remedied. . . .

(Agreement § 8.01(3).) The relevant terms of § 8.02 provides that:

> In the event this Agreement is terminated as provided in Section 8.01(3) . . . this Agreement shall be of no further force and effect . . . and there shall be no further liability on the part of Seller or Buyer under this Agreement. . . . Notwithstanding the foregoing, nothing contained in this Section 8.02 shall relieve any party hereto from liability for its breach of this Agreement, and the non-breaching party shall be entitled to all remedies, at law or in equity, available to it with respect to any such breach; provided, however, that Buyer's liability hereunder shall be limited to $1,000,000.

(Agreement § 8.02.)

In addition to §§ 8.01 and 8.02, WCC asserts that §§ 9.01 and 9.02 provided further protection to WCC against potential losses and damages. In § 9.01, WCC claims that GAN "expressly agreed to indemnify WCC for all damages resulting from any contract breach, including attorneys' fees." (WCC Local Rule 12(M) Stmt. ¶ 14.) Furthermore, § 9.02 detailed the procedure for requesting such indemnification from GAN. Section 9.01 states that:

> Seller hereby agrees to indemnify, defend and hold Buyer Free and harmless against any and all damages, claims, demands, losses, liabilities or expenses (including, without limiting the generality of the foregoing, reasonable attorneys' fees and court costs) incurred by the Company or Buyer by reason of (a) the breach of any warranty, representation, covenant or agreement of Seller contained herein, and (b) any disallowance or decrease in an admitted asset or increase in any liability of the Company directed by the Insurance Department of Iowa (the "Department") in connection with its examination of the financial condition of the Company as at December 31, 1991 or a subsequent date, but only to the extent the disallowances, decreases or increases should have been but were not reflected in the 1991 NAIC Statement (except to the extent such matters were reflected in the Closing Financial Statement, or, if not reflected in the Closing Financial Statement, except to the extent other adjustments required by the Department, whether as the result of any increases or decreases in assets or liabilities, would have offset such matters in computing the Purchase Price); provided, however, that the Buyer and the Company shall not make any claim against Seller for indemnification hereunder until the aggregate damage, loss, liability, cost and expense of Buyer or Company exceeds $100,-000. Seller's maximum aggregate liability hereunder shall not exceed $5,000,000; provided however, there shall be no limitation on Seller's liability with respect to matters relating to taxes and to the Designated Plans.

(Agreement § 9.01.) Section 9.02 provides that:

> If Buyer learns of any matter for which Buyer asserts Seller is liable under Section 9.01, then in order to secure indemnification with respect thereto, Buyer shall notify Seller in writing of the existence of such matter within a reasonable time. Seller shall have the right (but not the obligation) at its sole expense and in the name of Buyer or Company, as may be appropriate, to contest any matter involving a third party for which indemnification or defense has been sought by Buyer, provided Seller proceeds in good faith, expeditiously and diligently. Buyer shall cooperate and cause the Company to cooperate with Seller in such contest, provided any expenditures incurred in such cooperation shall be paid by Seller. If Seller does not serve on Buyer by certified mail, return receipt requested, a written notice of its intention to defend or does not commence to contest any matter within ten (10) business days after receipt of notice from Buyer of the existence of such matter, or if Seller disputes it is liable to Buyer for any sum pursuant to Sections 6.01, 9.01 or otherwise, the right to defend such claim shall be deemed waived, and Buyer shall have full right and power to defend or otherwise deal with and dispose of the matter. Buyer and the Company shall not pay or oth-

erwise settle compromise or deal with any matter for which Seller may be liable under Sections 6.01 or 9.01 hereof so long as Seller is contesting the matter in good faith, expeditiously and diligently in accordance with this Agreement, and no final judgment has been entered against the Buyer or the Company, as the case may be, except to the extent any such claim or matter may materially impair the ability of Buyer or the Company to engage in its business, in which event Buyer shall have the absolute right to pay, settle, compromise or otherwise dispose of such claim or matter.

(Agreement § 9.02.)

GAN disagrees with WCC's conclusory characterizations of the terms of the Agreement. First, GAN explains that the Agreement is not a bilateral contract for purchase and sale of HNL capital stock. Rather, the Agreement is a unilateral option contract giving WCC the exclusive right to elect whether to purchase HNL capital stock. Unless WCC formally and properly accepted the Agreement to purchase the stock, the Agreement conferred no bilateral rights and obligation to sell and purchase HNL stock.

Second, contrary to WCC's representation, the Agreement did not provide for a closing date. Third, pursuant to § 2.03, WCC's failure to accept the Agreement prior to the expiration of the due diligence period served as an automatic termination of the Agreement. No affirmative action on the part of WCC was necessary to terminate the Agreement. Fourth, WCC was not subject to any financial risk during the period between April 15, 1992, and May 15, 1992, because WCC was not under any contractual obligation to purchase HNL stock unless and until it accepted the terms of the Agreement in writing. Fifth, GAN disputes the purpose and the plain meaning of §§ 9.01 and 9.02. GAN argues that those two sections are not applicable to the instant litigation because WCC never accepted the Agreement to purchase the stock. Furthermore, those provisions govern the contingencies of third party

actions, not claims of WCC's own alleged damages.

A cursory review of the parties' argument reveals that many facts, characterizations, interpretations of the Agreement, and assertions are vigorously disputed between WCC and GAN. The court's duty in addressing the cross motions for summary judgment does not simply end with the issue of whether there are controverted facts. Rather, the court must sift through the facts presented by the parties to identify whether there are "genuine" issues of material fact. After a closer examination of the facts and the issues surrounding the instant motions, the court must conclude that the material facts are not in dispute and that GAN is entitled to judgment as a matter of law on counts I and II.

■■■ To resolve contract disputes, the court must first look to the language of the purported contract. *Woodbridge Place Apartments v. Washington Square Capital, Inc.*, 965 F.2d 1429, 1436 (7th Cir.1992). In the interpretation of contractual clauses under Illinois law,[8] the court's primary duty is to effectuate the intentions of the parties to the contract. *Lomas Mortgage U.S.A., Inc. v. W.E. O'Neil Constr. Co.*, 812 F.Supp. 841, 843 (N.D.Ill.1993). In doing so, the court must construe the contract as a whole to derive the intentions of the parties. *Howard Johnson & Co. v. Feinstein*, 241 Ill.App.3d 828, 182 Ill.Dec. 396, 399, 609 N.E.2d 930, 933 (1993). "Contractual terms should be construed to avoid the conclusion that other terms are meaningless." *Id.* Further, where the relevant terms are unambiguous, the parties' intent must be determined from the language of the contracting instrument itself without resorting to extrinsic evidence. *Wikoff v. Vanderveld*, 897 F.2d 232, 238 (7th Cir.1990); *Bennett & Kahnweiler, Inc. v. American Nat'l Bank & Trust Co. of Chicago*, 235 Ill.App.3d 896, 176 Ill.Dec. 112, 601 N.E.2d 810, 816 (1992).

■■■ In the instant action, certain provisions demonstrate that the Agreement was an option contract. "An option contract is an agreement in which one binds himself to

---

**8.** Section 11.06 of the Agreement provides that the "Agreement shall be governed by and shall be construed under the laws of the State of Illinois." (Agreement § 11.06.)

perform a certain act, at the sole power and discretion of optionee...." *Prime Group, Inc. v. Northern Trust Co.*, 215 Ill.App.3d 1065, 159 Ill.Dec. 918, 922, 576 N.E.2d 841, 845, *appeal denied*, 141 Ill.2d 559, 162 Ill. Dec. 507, 580 N.E.2d 133 (1991). The second characteristic of option contracts is that the optionor agrees to leave the agreement in effect for a specified or a reasonable time. *Id.* In contrast, a bilateral contract binds the offeror and the offeree after there is an offer, acceptance, and consideration. *Serpe v. Williams*, 776 F.Supp. 1285, 1287 (N.D.Ill. 1991); *Faulkner v. Gilmore*, 251 Ill.App.3d 34, 190 Ill.Dec. 455, 459, 621 N.E.2d 908, 912 (1993). The burden of proving the necessary elements to contract formation is on the party seeking to enforce the agreement. *Commonwealth Edison Co. v. Industrial Comm'n*, 167 Ill.App.3d 229, 118 Ill.Dec. 91, 93, 521 N.E.2d 159, 161 (1988).

There is ample evidence within the Agreement to conclude that the agreement to sell HNL stock was an option contract. Article I of the Agreement provides that GAN shall sell HNL stock to WCC for ten million dollars with certain conditions and warranties. (Agreement at 1–2.) Article II, § 2.03 provides that GAN's agreement to sell HNL stock was only good for thirty days, or sixty days in the event WCC provided valuable consideration for a thirty-day extension. (Agreement § 2.03.) In this case, the option period terminated on June 26, 1992. Section 2.03 of the Agreement provides that:

> Contemporaneously with the execution of this Agreement, Buyer shall pay to Seller the sum of $50,000 in consideration for Seller's agreement to permit Buyer to complete its due diligence review prior to Buyer's acceptance of this Agreement. Within thirty (30) days after the date hereof, Buyer shall either (i) advise Seller in writing that it is accepting this Agreement or (ii) pay to Seller an additional sum of $100,000 to extend the period of its due diligence review for another thirty (30) days, or (iii) advise Seller in writing that it is not accepting this Agreement. If the period of Buyer's due diligence review is extended for an additional thirty (30) days, on or prior to the end of the second thirty (30) day period, Buyer shall advise Seller in writing that it is either (iv) accepting this Agreement or (v) not accepting this Agreement. If by the applicable time periods set forth herein Seller does not receive a written notice from Buyer as to its intentions hereunder, Buyer shall be deemed to not have accepted this Agreement. If at any time hereafter Buyer advises Seller hereunder that [it] is not accepting this Agreement, this Agreement shall be terminated and of no further force and effect, the monies paid by Buyer to Seller hereunder shall be retained by Seller as liquidated damages and neither party shall have any liability to the other hereunder. In the event that Buyer elects to accept this Agreement as provided herein, Buyer shall make the earnest money deposit required under Article X hereof, the parties shall proceed to consummation of the transaction contemplated herein, and the sums paid by Buyer to Seller pursuant to this Section 2.03 shall be applied to the Purchase Price.

(Agreement § 2.03.) This section demonstrates that the agreement to buy and sell HNL stock was not accepted at the time of the formation of the Agreement on April 15, 1992, thus, no bilateral contract.

This is further evidenced by Article 10, §§ 10.01 and 10.02. Section 10.01 reads as follows:

> Contemporaneously with the *acceptance of this Agreement by [WCC] pursuant to Section 2.03*, WCC and GAN shall execute an Escrow Agreement ... and WCC shall deposit in cash or government securities into the Escrow Account created by the Escrow Agreement the sum of One Million Dollars ... less the sums paid pursuant to Section 2.03.

(Agreement § 10.01.) (Emphasis added). This provision undoubtedly establishes that a binding acceptance of the agreement to buy and sell did not occur on April 15, 1992, but contemplated by the parties to be in the future. Additionally, § 10.02 provides that "[t]he date upon which [WCC] accepts this Agreement pursuant to Section 2.03 shall be the date from and after which [WCC's] obligation to purchase the Shares under this

Agreement shall be deemed to be binding upon and effective as to the Buyer." (Agreement § 10.03.) This section evinces that WCC was under no contractual obligation to purchase the HNL stock on April 15, 1992. Accordingly, on April 15, 1992, with respect to the sale of HNL stock, there was only an option contract, rather than a bilateral sales contract.

■ Moreover, the option contract never became a bilateral contract binding GAN to sell HNL stock. An option contract becomes a bilateral contract binding both the optionor and optionee to the terms of the option contract when it is accepted and exercised. *Industrial Steel Constr., Inc. v. Mooncotch*, 264 Ill.App.3d 507, 202 Ill.Dec. 124, 127, 637 N.E.2d 663, 666 (1994); *Artful Dodger Pub, Inc. v. Koch*, 230 Ill.App.3d 806, 172 Ill.Dec. 760, 763, 596 N.E.2d 39, 42 (1992). The option, however, must be accepted according to its specific terms for the option to become a binding sales contract. *Chapman v. Brokaw*, 225 Ill.App.3d 662, 167 Ill.Dec. 821, 825, 588 N.E.2d 462, 466 (1992); *see also Venture Assoc. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 432 (7th Cir.1993) ("Illinois law demands that an acceptance 'comply strictly with the terms of the offer[.]'") (quoting *Ebert v. Dr. Scholl's Foot Comfort Shops, Inc.*, 137 Ill.App.3d 550, 92 Ill.Dec. 323, 330, 484 N.E.2d 1178, 1185 (1985)).

The material facts in this case demonstrate as a matter of law that the Agreement never became a binding contract for the sale of HNL stock. According to the specific terms of the Agreement in this case, if WCC wanted to accept and exercise the option, WCC was required to express its intention to accept in writing. (Agreement § 2.03.) Furthermore, contemporaneously with the written acceptance, WCC was required to exe-

cute an Escrow Agreement and deposit one million dollars in cash or government securities, less the sum paid pursuant to § 2.03,[9] into the escrow account. (Agreement § 10.01.) WCC, however, never expressed its intention to exercise the option and to purchase HNL stock, enter into an Escrow Agreement, or deposit the requisite earnest money. Under these circumstances, GAN did not, as a matter of law, breach the Agreement because there was never a valid acceptance of the Agreement. Accordingly, GAN is entitled to a judgment in its favor on counts I and II.[10]

While the court concludes that the Agreement was an option contract which terminated on June 26, 1992, without any legal force, certain provisions of the Agreement did require GAN to perform certain acts during the option period. In defining the parameters of GAN's obligation, the court looks to what WCC received in exchange for the $150,000 payment to GAN in addition to the option period. An examination of the Agreement reveals that sections 1.06(a), 2.01, 2.02, 3.22, 5.01, 5.04(a), 5.05(a), 5.06, and 5.07 govern GAN's obligations during the option period. The issue of whether GAN complied with these provisions will be resolved at an appropriate time under count III when it is properly before the court.

Further, the court finds the other sections of the Agreement irrelevant given its ruling that WCC never accepted the Agreement during the option period. The sections not mentioned would have been relevant only if the option contract became a bilateral contract for the sale of HNL stock on or before June 26, 1992. Accordingly, in litigating count III, the parties are to limit their scope of engagement to the relevant sections of the Agreement.

---

**9.** In this case, the required earnest money was $850,000 ($1 million less $150,000).

**10.** Gan in its motion for summary judgment seeks judgment in its favor as to counts I and II in their entirety on the basis that these counts are based on WCC's false premise that the Agreement was a bilateral contract when executed on April 15, 1992. Count I, however, also contains allegations that Gan breached its promise to cooperate during the due diligence investigation. This method of pleading, i.e., mixing multiple

claims and theories of recovery under one count, violates Federal Rule of Civil Procedure 10(b). For this reason, the court will strike those allegations related to GAN's alleged violation of its duty to cooperate during the due diligence review. Resolving counts I and II in this manner will not prejudice WCC but only clarify the record. The claim that GAN violated its obligation to cooperate with and to provide certain information to WCC is also alleged under count III and will be resolved under count III.

## CONCLUSION

For the foregoing reasons, GAN's motion for summary judgment on counts I and II of the complaint is granted and WCC's motion for partial summary judgment on counts I and II of the complaint is denied.

IT IS SO ORDERED.